

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-14-2001

# Joint Stock Society v. UDV N Amer Inc

Precedential or Non-Precedential:

Docket 99-5422

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Joint Stock Society v. UDV N Amer Inc" (2001). *2001 Decisions.* Paper 211.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/211

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 14, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-5422

THE JOINT STOCK SOCIETY, "Trade House of
Descendants of Peter Smirnoff, Official
Purveyor to the Imperial Court" and THE
RUSSIAN AMERICAN SPIRITS COMPANY,
        Appellants

v.

UDV NORTH AMERICA, INC. and
PIERRE SMIRNOFF COMPANY

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE

(Dist. Court No. 95-749-GMS)
District Court Judge: Gregory M. Sleet

Argued September 27, 2000

Before: BECKER, Chief Judge, and ALITO and
FUENTES, Circuit Judges.

(Opinion Filed: September 14, 2001)

        James W. Hawkins (Argued)
        Hilary Harp
        Todd E. Jones
        Powell, Goldstein, Frazer, &
         Murphy LLP
        191 Peachtree Street, 16th Floor
        Atlanta, Georgia 30303

Duncan M. Grant
Pepper Hamilton LLP
1201 Market Street, Suite 600
P.O. Box. 1709
Wilmington, Delaware 19899-1709

 Attorneys for Appellants

Arlin M. Adams
Schnader, Harrison, Segal &
 Lewis LLP
Suite 3600
1600 Market Street
Philadelphia, Pennsylvania 19103

 Attorney for Amicus Curiae
in Support of Appellants

Allen M. Terrell, Jr.
Richards, Layton & Finger
One Rodney Square
Wilmington, Delaware 19899

William L. Webber (Argued)
Kenneth W. Brothers
Kelly A. Clement
Charles A. Loughlin
Erik Bertin
Howrey Simon Arnold & White, LLP
1299 Pennsylvania Avenue, N.W.
Washington, District of
 Columbia 20004

 Attorneys for Appellees

OPINION OF THE COURT

ALITO, Circuit Judge:

The Joint Stock Society ("Joint Stock") and the Russian American Spirits Company ("RASCO"), filed this action against UDV North America, Inc. ("UDV") and the Pierre Smirnoff Company, asserting claims under the Lanham Act, 15 U.S.C. S 1051 et seq., for false designation of origin,

2

false advertising, and trademark cancellation. The plaintiffs also raised claims under the Delaware Uniform Deceptive Trade Practices Act, 6 Del. Code SS 2531-36 et seq. The plaintiffs alleged that the defendants have fostered the mistaken impression that Smirnoff vodka is made in Russia and is the same product that was produced in Russia and sold to the czar before the Russian Revolution. The District Court dismissed the complaint for lack of subject matter jurisdiction, holding that the plaintiffs had failed to present a case or controversy that was ripe for decision within the meaning of Article III of the United States Constitution and that, even if the plaintiffs' claims were ripe, the plaintiffs did not meet constitutional or prudential standing requirements. In the alternative, the Court granted summary judgment in favor of the defendants under the doctrine of laches. See Joint Stock Soc'y v. UDV N. Am., Inc., 53 F. Supp. 2d 692 (D. Del. 1999). We hold that the plaintiffs did not satisfy Article III or prudential standing requirements, and we affirm the judgment of the District Court.

I.

In the 1860s, Piotr Arsenvitch Smirnov ("P.A. Smirnov") began a vodka trade house in Russia named "P.A. Smirnov in Moscow." During his lifetime, P.A. Smirnov built his trade house into a nationally and internationally renowned vodka distillery, winning numerous awards. Perhaps the greatest recognition he received was being named the "Official Purveyor to the Russian Imperial Court" in 1886.

P.A. Smirnov died in 1898, leaving the trade house to his widow and five sons. After his widow died in 1899, the business was owned by his sons, who were, from eldest to youngest, Piotr, Nikolai, Vladimir, Sergei, and Alexey. The plaintiffs allege that the three oldest brothers bought Sergei's and Alexey's interests in the business in 1902. Plaintiffs also allege that Nikolai and Vladimir sold their interests to Piotr in 1904 or 1905, leaving Piotr as the sole owner of the trade house. In addition, the plaintiffs claim that Vladimir agreed to relinquish his "right to the company name, privileges, and honors" in exchange for monetary compensation. When Piotr died in 1910, his wife, Eugenia,

became the sole owner of the trade house. She operated the trade house successfully until 1917.

In 1917, as the Bolshevik revolution spread through Russia, Eugenia married an Italian diplomat and fled to Italy. She eventually settled in Nice, France. In 1918, the newly formed Communist government in Russia nationalized the Smirnov trade house. Under state control, the trade house no longer used the "Smirnov" name, although vodka production continued.

Also in flight from the Russian Revolution, Vladimir relocated to Constantinople. In 1920, he established a distillery under the name "Supplier to the Imperial Russian Court, Pierre Smirnoff Sons." By 1924, Vladimir had moved to Lvov, Poland, and had opened a vodka distillery. In 1925, he opened another distillery in Paris under the name of "Ste. Pierre Smirnoff Fils" or "The Company of the Sons of Peter Smirnoff."

In 1933, Ste. Pierre Smirnoff Fls. entered into an agreement with Rudolph Kunett, an American businessman. Under this agreement, Vladimir granted Kunett the exclusive right to manufacture and market Smirnoff vodka in the United States in exchange for monetary compensation. Kunett soon thereafter assigned his rights to himself, Benjamin B. McAlpin, Jr., Donald M. McAlpin, and Townsend M. McAlpin. Those four individuals, in turn, assigned their rights to a newly created New York corporation, Ste. Pierre Smirnoff Fls., Inc. (NY). In 1934, Ste. Pierre Smirnoff Fls., Inc. (NY) began the production and sales of vodka in the United States, using the name of "Smirnoff "1 and the historical Smirnoff marks.2

_____

1. As the parties concede, there is no material difference between the "Smirnoff " and "Smirnov" names. However, in order to differentiate between the parties and their respective products, we use the name "Smirnov" when referring to the plaintiffs' products and Smirnoff when referring to those made by the defendants.

2. The historical marks of which Joint Stock complains include, but are not limited to, the use of Cyrillic characters, a crown, a shield and red shroud from the Russian Imperial Court, and several medals bearing the state coat of arms for Russia.

4

Five years later, G.F. Heublein & Bro. purchased Ste. Pierre Smirnoff, Fls., Inc. (NY). G.F. Heublein & Bro. established a Connecticut subsidiary to manufacture and market the sale of Smirnoff vodka in the United States, Ste. Pierre Smirnoff, Fls. (CT). In 1955, G.F. Heublein & Bro. changed its name to Heublein, Inc. Since then, Heublein and its successor, UDV, have marketed Smirnoff vodka successfully, currently manufacturing approximately six million cases per year. Smirnoff is now the largest-selling vodka brand in the United States and the second largest-selling distilled spirit. Smirnoff still uses labeling and advertising that is heavily dependent on its association with P.A. Smirnov and the Russian trade house. For example, the label of a Smirnoff vodka bottle refers to Ste. Pierre Smirnoff Fls. as "Purveyors to the Imperial Russian Court 1886-1917" and "successors to the world-famous Pierre Smirnoff." The label also includes a crown, shield, and red shrouds from the Russian Imperial Court, as well as several medals bearing the state coats of arms for Russia.

Eugenia first learned of Vladimir's use of the Smirnoff name and marks around 1925. Upset that Vladimir was marketing Smirnoff vodka without permission, she wrote a letter to her husband asking for advice. Her husband responded that any legal action would require documentary proof of her claim to be the sole owner of the Smirnov trade house. However, all papers proving the ownership of the trade house were still in Russia, where the Communist regime was repressing all facets of private enterprise. Fearing that she would be prosecuted by the Soviet authorities if she tried to obtain the needed documents in Russia, Eugenia elected not to make an attempt. She did, however, write letters to friends and family in Russia asking for their help. Eugenia also had her daughter, Tatyana, write letters to friends, relatives, and organizations to enlist their aid in obtaining documentary proof, but there is no evidence that either Eugenia or Tatyana contacted Vladimir to bring this issue to his attention.

During the 1930s, Eugenia and her family became aware that Vladimir had sold his "rights" to the Smirnoff name to Kunett and that Kunett was manufacturing Smirnoff vodka in the United States and was using the Smirnoff name and

5

marks. Nevertheless, no one contacted either Kunett or the later producers of Smirnoff vodka in America, Ste. Pierre Smirnoff Fls. Inc. (NY), to inform them of Eugenia's claim to the Smirnoff name.

In 1958, Eugenia died. Prior to her death, however, Eugenia executed a document giving Tatyana "power of attorney" over the "defense of [her] interest in asserting [her] rights to the ownership and title of `SMIRNOFF VODKA' . . . which [she believed had] been unjustly used by third parties in violation of her rights." In 1977, Tatyana died intestate in France, with her "rights" in Smirnoff passing to her sons, Boris Alexandrovich Smirnoff and George Smirnoff. George Smirnoff died the next year, never having informed Heublein of his claim to the rights surrounding the name "Smirnoff." Nor did Boris Alexandrovich Smirnoff ever inform Heublein of his claim until 1994, when he learned of Joint Stock's dispute with Heublein.

II.

As noted, the plaintiffs-appellants in this case are Joint Stock and RASCO. Neither of the plaintiffs has a direct connection to Eugenia, Tatyana, Boris Alexandrovich, or George (collectively, the "French Smirnovs"). Instead, both are recently formed companies that wish to import and sell vodka in the United States under the Smirnov name.

Joint Stock was chartered in Russia in 1993 as "Trade House of Descendants of Peter Smirnov, Official Purveyor to the Imperial Court." The principal owners of Joint Stock are Andrei and Boris Alexeseevich Smirnoff (as distinguished from Boris Alexandrovitch Smirnoff, Eugenia's son), who are the descendants of P.A. Smirnov's two youngest sons, Sergei and Alexey. Joint Stock, in conjunction with Russian vodka manufacturers, currently produces and markets vodka under the Smirnov name in Russia.

RASCO is a Delaware corporation headquartered in Connecticut. RASCO has an agreement with Joint Stock under which RASCO would be the exclusive licensee for any rights Joint Stock might obtain in the Smirnoff or Smirnov trademark and trade name. RASCO was incorporated by an

agent of Joint Stock with this purpose in mind. Neither Joint Stock nor RASCO has ever sold vodka in the United States.

The defendants-appellees in this case are UDV and the Pierre Smirnoff Company. As detailed above, UDV, a Connecticut corporation, and its predecessors have manufactured, sold, distributed, and marketed the Smirnoff brand of vodka products in the United States since 1934. Between 1934 and 1997, UDV and its predecessors obtained 17 trademark registrations in the United States for various Smirnoff marks. The Pierre Smirnoff Company, a Delaware Corporation, is the wholly owned subsidiary of UDV responsible for the marketing of Smirnoff vodka. The defendants and their predecessors heavily promoted the Smirnoff brand, spending more than $700 million for advertising and marketing over the past 60 years.

The plaintiffs in this case contend that the defendants have misappropriated the Smirnov name and that they have misled consumers into believing that Smirnoff vodka is made in Russia and is the same as the product that was produced in Russia and purveyed to the czar before the revolution. In fact, they allege that Smirnoff vodka is made in the United States using ingredients and a process that sharply differ from that used in Russia before 1917. Instead of pure Russian water, they say, Smirnoff uses filtered city tap water, and instead of neutral spirits derived from Russian wheat, Smirnoff is made using American corn. Moreover, the date 1818 on the Smirnoff label, according to the plaintiffs, is deceptive, since the Russian trade house was not founded until 1860, and manufacture of the distinctive American vodka sold under the Smirnoff mark did not commence until the 1930s.

The complaint in this action contained seven counts. Counts one and two asserted claims for, respectively, false designation of origin and false advertising, in violation of Section 43(a)(1)(A) and (B) of the Lanham Act, 15 U.S.C. SS 1125(a)(1)(A) and (B).3 In support of these claims, the

---

3. Section 43(a)(1)(A) and (B) provide as follows:

    (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term,

7

complaint referred to the defendants' use of "the trademark and trade name SMIRNOFF " and "the Smirnoff family crest, insignia, emblems, and medals." Counts one and two alleged that the defendants' false designation of the origin of their products and false advertising had caused damage to the plaintiffs and was likely to continue to do so. It is important to note that, although the plaintiffs' presentation of their position often tends to foster a contrary impression, these claims under Section 43(a) are not dependent on any right that the plaintiffs may assert to the use of the Smirnov or Smirnoff name. As plaintiffs' counsel acknowledged at oral argument, the plaintiffs could have asserted these claims even if they marketed their product under a wholly unrelated name. The essence of these claims is not that the defendants have no legitimate right to the use of the Smirnoff marks but that the defendants have propagated the false impression that Smirnoff vodka is Russian and is essentially the same product that was produced by P.A. Smirnov in czarist days. As the Second Circuit stated, "Section 43(a) is intended to reach false advertising violations, not false registration claims." La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc., 495 F.2d 1265, 1271 n.6 (2nd Cir. 1974); see also Charles E. McKenney & George F. Long III, Federal Unfair Competition: Lanham Act S 43(a) S 2.02[6] (2000) ("Defendant's attempts to establish trademark rights . . . does not state a Section 43(a) violation, nor are efforts by defendant to obtain fraudulent registrations redressable under Section 43(a).")

_____

        name, symbol, or device, or any combination thereof, or any false
        designation of origin, false or misleading description of fact, or
false
        or misleading representation of fact, which--

        (A) is likely to cause confusion, or to cause mistake, or to
deceive as
        to the affiliation, connection, or association of such person with
        another person, or as to the origin, sponsorship, or approval of
his
        or her goods, services, or commercial activities by another person,
or

        (B) in commercial advertising or promotion, misrepresents the
        nature, characteristics, qualities, or geographic origin of his or
her
        or another person's goods, services, or commercial activities,

        shall be liable in a civil action by any person who believes that
he
        or she is or is likely to be damaged by such act.

Count three asserted a claim under Section 38 of the
Lanham Act, 15 U.S.C. S 1120,4 which imposes civil liability
for damages sustained by a person injured as a result of
the procurement of the registration of a mark by a false or
fraudulent declaration. Count three alleged that the
defendants had obtained registration of their trademarks by
filing papers that they knew were false or fraudulent.

Count four, which was based on Sections 14 and 37 of
the Lanham Act, 15 U.S.C. SS 1064 and 1119, 5 sought
cancellation of the defendants' marks, as well as other
relief, and count five, which was grounded on Section 34 of
the Lanham Act, 15 U.S.C. S 1116,6  sought an injunction
against further violations of Section 43.

_____

4. Section 38 of the Lanham Act, 15 U.S.C. S 1120, provides as follows:

> Any person who shall procure registration in the Patent and
> Trademark Office of a mark by a false or fraudulent declaration or
> representation, oral or in writing, or by any false means, shall be
> liable in a civil action by any person injured thereby for any
> damages sustained in consequence thereof.

5. Section 14 of the Lanham Act, 15 U.S.C. S 1064, provides in pertinent
part as follows:

> A petition to cancel a registration of a mark, stating the grounds
> relied upon, may, upon payment of the prescribed fee, be filed as
> follows by any person who believes that he is or will be damaged,
> including as a result of dilution under section 1125(c) of this
title,
> by the registration of a mark on the principal register established
by
> this chapter, or under the Act of March 3, 1881, or the Act of
> February 20, 1905. . . .

The statute then goes on to specify, among other things, when such a
petition must be filed.

Section 37 of the Lanham Act, 15 U.S.C. S 1119, provides as follows:

> In any action involving a registered mark the court may determine
> the right to registration, order the cancelation of registrations,
in
> whole or in part, restore canceled registrations, and otherwise
rectify
> the register with respect to the registrations of any party to the
> action. Decrees and orders shall be certified by the court to the
> Director, who shall make appropriate entry upon the records of the
> Patent and Trademark Office, and shall be controlled thereby.

6. Section 34(a) of the Lanham Act, 15 U.S.C.S 1116(a), provides in pertinent part as follows:

9

Finally, counts six and seven asserted claims under the
Delaware Uniform Deceptive Trade Practices Act, 6 Del.
Code SS 2531-36 et seq.7 These counts alleged that the

_____

       The several courts vested with jurisdiction of civil actions
arising
       under this chapter shall have power to grant injunctions, according
       to the principles of equity and upon such terms as the court may
       deem reasonable, to prevent the violation of any right of the
       registrant of a mark registered in the Patent and Trademark Office
       or to prevent a violation under subsection (a), (c), or (d) of
section
       1125 of this title. . .

7. The provision of the Delaware Act that defines"deceptive trade
practices," 15 Del. Code S 2532, provides in pertinent part as follows:

        (a) A person engages in a deceptive trade practice when, in the
       course of a business, vocation, or occupation, that person:

        (1) Passes off goods or services as those of another;

        (2) Causes likelihood of confusion or of misunderstanding as to
       the source, sponsorship, approval, or certification of goods or
       services;

        (3) Causes likelihood of confusion or of misunderstanding as to
       affiliation, connection, or association with, or certification by,
       another;

        (4) Uses deceptive representations or designations of geographic
       origin in connection with goods or services;

        (5) Represents that goods or services have sponsorship,
       approval, characteristics, ingredients, uses, benefits, or
quantities
       that they do not have, or that a person has a sponsorship,
approval,
       status, affiliation, or connection that the person does not have;

        (6) Represents that goods are original or new if they are
       deteriorated, altered, reconditioned, reclaimed, used, or
secondhand;

        (7) Represents that goods or services are of a particular
       standard, quality, or grade, or that goods are of a particular
style or
       model, if they are of another;

        (8) Disparages the goods, services, or business of another by
       false or misleading representation of fact;

(9) Advertises goods or services with intent not to sell them as advertised;

10

defendants' use of the Smirnoff mark and the Smirnoff family crest, insignia, emblem, and medals constituted deceptive trade practices.

In its prayer for relief, the complaint sought, among other things, damages under the Lanham Act and treble damages under the Delaware Uniform Deceptive Trade Practices Act, a judgment declaring the defendants' marks null and void and an order directing that the marks be canceled, and an injunction prohibiting further violations of the Lanham Act or the Delaware Act.

The defendants moved for summary judgment on all claims on several grounds, and the District Court subsequently entered an order that dismissed the complaint for lack of subject matter jurisdiction and, in the alternative, granted the defendant's summary judgment motion in part. The Court first held that the plaintiffs had failed to establish the existence of an Article III case or controversy that was ripe for adjudication. Joint Stock, 53 F. Supp. 2d at 703. The Court observed that "the plaintiffs ha[d] not meaningfully or adequately prepared to begin selling their SMIRNOV vodka products in the United States." Id. at 702. The Court also held that the plaintiffs lacked both constitutional and prudential standing and that their claims were barred by laches. Id. at 701. Constitutional standing was lacking, the Court concluded, because the plaintiffs admitted that they would not attempt to enter the United States market unless they prevailed in this litigation and, therefore, "they ha[d] not demonstrated that they ha[d] suffered an actual or imminent injury or [were] likely to suffer an injury in the future." Id. at 707. As for prudential standing under the Lanham Act, the Court

---

(10) Advertises goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

(11) Makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of, price reductions; or

(12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

11

held that the plaintiffs' injuries were not the type that were intended to be redressed by Section 43(a) of the Lanham Act, that their injuries were indirect and speculative, and that the risk of duplicative damages was too great. Id. at 708–11. In addition, the Court concluded that the plaintiffs did not have standing under Sections 37 and 38 of the Lanham Act or the Delaware Act, and that Section 14 of the Lanham Act does not authorize cancellation of a mark by a court but instead applies only to the Patent and Trademark Office. Id. at 711–12 & n.16. Finally, the Court held that, even if the plaintiffs' claims were ripe and they had standing, the Court would nevertheless grant the defendant's summary judgment motion on the basis of laches. Id. at 712. The Court cited the failure of the French Smirnovs to take any action to alert Kunett or Heublein of their claims, and the Court concluded that the defendants would suffer great "economic prejudice" and"evidentiary prejudice" if the case were now allowed to proceed. Id. at 717–21.

On appeal, the plaintiffs contest the dismissal of all their claims except those under Section 38 of the Lanham Act. See Reply Brief at 30 n.13. They argue that, contrary to the decision of the District Court, they satisfied the requirements of Article III, their case is ripe, they have standing, and summary judgment based on laches was improper.

III.

We turn first to the requirements of Article III of the Constitution. Article III, section 1 confers upon the federal courts "[t]he judicial Power of the United States," and Article III, Section 2 provides that this power extends to specified categories of "Cases" and "Controversies." As a result, " `[t]he existence of a case and [or] controversy is a prerequisite to all federal actions.' " Philadelphia Fed'n of Teachers v. Ridge, 150 F.3d 319, 322–23 (3d Cir. 1998) (quoting Presbytery of N.J. of Orthodox Presbyterian Church v. Florio, 40 F.3d 1454, 1462 (3d Cir. 1994)).

The Article III case-or-controversy requirement includes ripeness and standing requirements. See Clinton v. City of

New York, 524 U.S. 417, 429 & n. 15 (1998) (standing); Philadelphia Fed'n of Teachers, 150 F.3d at 322–323 & n.3 (ripeness). These two doctrines are related and to some degree overlap. Pic–A–State PA Inc. v. Reno, 76 F.3d 1294, 1298 n.1 (3d Cir. 1996); Armstrong World Indus., Inc. v. Adams, 961 F.2d 405, 411 n.13 (3d Cir. 1992). We have said that "[w]hereas ripeness is concerned with when an action may be brought, standing focuses on who  may bring an action." Pic–A–State, 76 F.3d at 1298 n.1 (emphasis in original); see also Presbytery of N.J., 40 F.3d at 1462; Armstrong World Indus., 961 F.2d at 411 n.13. But as noted in Lee v. Oregon, 207 F.3d 1382, 1387–88 (9th Cir. 1997):

> The overlap between these concepts has led some legal commentators to suggest that the doctrines are often indistinguishable. See, e.g., Erwin Chemerinsky, A Unified Approach to Justiciability, 22 Conn. L. Rev. 1139, 677, 681 (1990). And, in "measuring whether the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical, the ripeness inquiry merges almost completely with standing." Gene R. Nichol, Jr., Ripeness and the Constitution , 54 U. Chi. L. Rev. 153, 172 (1987).

Although the Article III issues in this case could be addressed under either doctrine, we find it preferable to do so under the doctrine of standing.

In considering whether the plaintiffs meet the standing requirements of Article III, we will focus on the plaintiffs' Section 43(a) and Delaware–law claims. Although the plaintiffs, as noted, also asserted claims under Sections 14, 34, 37, and 38 of the Lanham Act, the plaintiffs do not contest the grant of summary judgment against them on their Section 38 claim, see Reply Brief at 30 n.13, and they take the position that their standing with respect to their Section 14, 34, and 37 claims is dependent on their standing with respect to the Section 43(a) claims. See Brief for Appellants at 49; Reply Brief at 29–30. Thus, our current discussion is confined to the plaintiffs' standing to litigate their claims under Section 43(a) and the Delaware Act.

13

The doctrine of standing incorporates both a constitutional element and a non-constitutional, "prudential" element. See The Pitt News v. Fisher, 215 F.3d 354, 359 (3d Cir. 2000); Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 484 (3d Cir. 1998). Constitutional standing is a threshold issue that we should address before examining issues of prudential standing and statutory interpretation. See Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 94 (1998); Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc., 165 F.3d 221, 224 (3d Cir. 1998). The question of the plaintiffs' prudential standing under the Lanham Act and the Delaware Uniform Trade Practices Act will be taken up in Parts IV and V.

Constitutional standing "is the `irreducible constitutional minimum' of standing." Trump Hotels, 140 F.3d at 484 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). Constitutional standing has three elements, all of which must be met: (1) the plaintiff must have suffered an injury in fact; (2) there must be a causal nexus between that injury and the conduct complained of; and (3) it must be likely that the injury will be redressed by a favorable judicial decision. See Lujan, 504 U.S. at 560-61; Pitt News, 215 F.3d at 359-361; Trump Hotels, 140 F.3d at 484-85; Conte Bros., 165 F.3d at 225. "These requirements ensure that plaintiffs have a `personal stake' or `interest' in the outcome of the proceedings, `sufficient to warrant . . . [their] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on . . .[their] behalf.' " Wheeler v. Travelers Ins. Co. , 22 F.3d 534, 537-38 (3d Cir. 1994) (citations omitted) (quoting Warth v. Seldin, 422 U.S. 490, 498-99 (1975)). "The party invoking federal jurisdiction bears the burden of establishing [these] elements." Lujan, 504 U.S. at 561. Furthermore, when standing is called into question at the summary judgment stage, as it was in this case, the plaintiff cannot rely on mere allegations "but must `set forth' by affidavit or other evidence `specific facts,' Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true." Id.

The plaintiffs in the case before us claim that they have

14

suffered or are suffering seven injuries due to the defendants' illegal conduct. These are: (1) the barrier to entry into the United States vodka market "erected by Defendants' false advertising, false designation of origin, and illegally obtained trademarks"; (2) the plaintiffs' "inability to enter into distribution contracts in the United States"; (3) their "inability to control the use of the name and designations of their predecessor"; (4) the loss of the royalties from the defendants' "unauthorized and false association with P.A. Smirnov"; (5) "the inevitable and imminent" denial by the Bureau of Alcohol, Tobacco, and Firearms ("BATF ") of plaintiffs' application for a permit to import vodka with the Smirnov label";8  (6) the harm to their ability to compete "arising from public misperceptions about Defendants' vodka caused by their false advertising and designation of origin"; and (7) the plaintiffs' inability to issue press releases in the United States without being sued by the defendants. See Brief for Appellants at 26-27.

In analyzing whether any of the plaintiffs' seven putative injuries suffice for constitutional standing, we start by noting that these harms are susceptible to one of two characterizations, both of which the plaintiffs have employed at various times during this appeal: Under the first characterization, these asserted injuries are not dependent on the plaintiffs' inability to use the Smirnov name in this country; under the second, these injuries are dependent on the plaintiffs' ability to use that name. It is worth noting, however, that the exact characterization of the plaintiffs' injuries is not dispositive of the constitutional standing issue because, under either characterization, we believe that the plaintiffs have failed to establish Article III standing.

Under the first characterization, the plaintiffs' injury is unrelated to their asserted rights to the Smirnoff or

_____

8. It is unlawful to import distilled spirits without a "basic permit" issued
by the Secretary of the Treasury. 27 U.S.C. S 203(a)(1). As the plaintiffs note (Brief for Appellants at 37), if they applied for a "basic permit" to import vodka with the Smirnov name, it is likely that the application would be rejected due to the defendants' registered trademarks. See 27 U.S.C. SS 204(a)(2)(C), 205(e).

15

Smirnov name. Put another way, the defendants' allegedly false advertising and false designation of origin harms the plaintiffs in the same way in which it harms other vodka manufacturers. For instance, the defendants' putatively false or misleading depiction of their vodka as a Russian product with a considerable historical pedigree may influence consumers to purchase Smirnoff vodka when, all other things being equal, those consumers would ordinarily have selected another brand. Under this set of facts, the defendants' allegedly false advertising harms the plaintiffs by channeling consumers toward the Smirnoff brand, but every other vodka manufacturer experiences the same type of injury. Moreover, one of the core injuries asserted by the plaintiffs is their inability to enter the United States vodka market due to the defendants' false advertising; this is the gravamen of harms (1), (2), and (6) listed above. Again, however, under the first characterization of the plaintiffs' injuries, this type of injury is not unique to the plaintiffs. Just as the allegedly false advertising may have impeded the plaintiffs' ability to enter the United States market-- e.g., by diverting vodka consumers with a preference for Russian brands to Smirnoff vodka, and away from other genuine Russian-made vodka--it would have had a similarly negative impact on the ability of all other Russian vodka manufacturers seeking to export their product to the United States.

We believe that the plaintiffs' putative injuries, when characterized in this manner, do not suffice for Article III standing. At this summary judgment stage, plaintiffs have failed to create a genuine issue that they have suffered an injury in fact for the simple reason that the plaintiffs have never marketed any vodka in the United States and have not adduced any evidence establishing that they are prepared at this time to sell any vodka in this country without using the Smirnov name. The defendants' allegedly false advertising cannot have harmed the plaintiffs by channeling their customers toward Smirnoff when the plaintiffs have not even begun offering their product for sale in the United States.

Importantly, as the plaintiffs' counsel acknowledged at oral argument, the plaintiffs could have asserted their false

16

advertising and false designation of origin claims even if they had marketed their vodka in the United States not under the Smirnov brand, but under a totally unrelated name. For instance, the plaintiffs could have renamed their product "Muscovy vodka," and exported it for sale in the United States under that name. The defendants' use of the Smirnoff marks would not have posed any formal obstacle to entry––e.g., the denial of a basic permit from the BATF, see supra note 8, or the possibility of a trademark infringement suit initiated by the defendants––because the plaintiffs' vodka would have been offered for sale under a mark that would not be likely to create confusion with the defendants' existing Smirnoff marks.

In this case, however, the plaintiffs have insisted on entering the United States vodka market only under the Smirnov mark. If the plaintiffs had shipped even a small amount of Russian vodka to this country for sale under a different name, they likely would have established a sufficient injury in fact. All that the Article III's injury-in-fact element requires is "an identifiable trifle" of harm, United States v. Students Challenging Regulatory Action Procedures, 412 U.S. 669, 689 n.14 (1973), which presumably could have been met by showing that some consumers who bought the defendants' product under the mistaken belief that is was of Russian origin and carried a notable pedigree would have otherwise bought the plaintiffs' product. Similarly, if the plaintiffs were poised to ship vodka to this country under a name other than Smirnov, they might have been able to show that they faced a sufficiently "imminent" threat of injury to satisfy the injury-in-fact requirement. See Lujan, 504 U.S. at 560. But as things now stand, any future diminution of sales in this country, or any potential barrier to entering the United States vodka market, is "conjectural" or "hypothetical," Lujan, 504 U.S. at 560 (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990), since the plaintiffs have not expressed an intention to ship vodka here unless they are able to use the Smirnov name. Thus, the first characterization of the plaintiffs' putative injury does not yield constitutional standing, as Article III's injury-in-fact requirement is not satisfied.

17

We turn, therefore, to the second characterization of the plaintiffs' asserted injuries--i.e., one that is dependent on the plaintiffs' inability to use the Smirnov name in the United States in connection with their vodka. Under this second, alternative characterization of the plaintiffs' asserted injury, the plaintiffs have suffered a harm due to their unique claim to the Smirnoff or Smirnov name and marks. Put another way, the core of the plaintiffs' claim here is that they possess superior rights to Smirnoff marks, and that the defendants have interfered with and appropriated the benefits of those superior rights by employing those marks in the United States vodka market. This appears to be the logic behind harms (3), (4), (5), and (7). Moreover, one can characterize harms (1) and (2) in this fashion: The defendants' use of the Smirnoff marks in the United States market has created a specific barrier to entry to the plaintiffs' brand, since the threat of a trademark infringement suit (and the denial of a basic permit) prevents the plaintiffs from entering into distribution contracts and selling their vodka in the United States under the confusingly-similar Smirnov name.

Although the plaintiffs' asserted harms, when characterized in this second fashion, would likely satisfy the injury-in-fact requirement, we believe that the plaintiffs lack Article III standing because there is no "causal connection between the injury and the conduct complained of," Trump Hotels, 140 F.3d at 485 (citing Lujan, 504 U.S. at 560-61). Under this second characterization,"the conduct complained of "--i.e., the defendants' allegedly false and misleading misrepresentation of their vodka as a Russian product once manufactured by P.A. Smirnov and sold to the Russian imperial family--is not the cause of the core injury claimed by the plaintiffs--i.e., their inability to use the Smirnov names in the United States vodka market. Rather, it is the defendants' prior use of the marks in the United States market. This use spanned several decades, involved hundreds of millions of dollars in expenditures, and resulted in the creation of considerable goodwill associated with the Smirnoff brand.

To be sure, the plaintiffs could (and do) claim that they had rights to the Smirnov and Smirnoff marks superior to

that of the defendants (presumably, through the plaintiffs' association with the French Smirnovs, who claim a right to the Smirnoff marks through Eugenia). The typical vehicle for asserting such a claim is a trademark infringement action. If this were a trademark infringement suit, then the Article III causal connection would most likely be present, as the "the conduct complained of "--i.e., the defendants' infringing use of the plaintiffs' marks--would have directly caused the plaintiffs' putative injury. In this case, however, the plaintiffs have stressed that they are not bringing a trademark infringement suit, but rather an action for false advertising and false designation of origin. See Appellant's Brief at 4. Viewed as part of a false advertising suit, the plaintiffs' putative injuries simply lack the requisite causal connection to the defendants' allegedly false advertising. Suppose, for example, that the labels of the defendants' products and promotions made it perfectly clear that their Smirnoff vodka was made in the United States using American ingredients and an entirely new American recipe and method not endorsed by the original P.A. Smirnov or the French Smirnovs. It is doubtful that the plaintiffs would have a basis for their Section 43(a) or Delaware deceptive trade practices claims; the defendants' marketing would be, after all, neither false nor misleading. Nonetheless, the plaintiffs ability to enter the United States market under the Smirnov name would be no greater than it is now, due to the fact that the defendants have employed and continue to employ an established set of marks associated with the Smirnoff name in that market. Consequently, it is apparent that, under this second characterization, the plaintiffs' putative injuries are not "fairly traceable to the challenged action of the defendant[s]," but are rather the result of an independent cause. Lujan, 504 U.S. at 560; see also Simon v. Easter Ky. Welfare Rights Org., 426 U.S. 26, 41-42 (1976).

Thus, we conclude that, under either of the two alternative characterizations of the plaintiffs' injuries, the plaintiffs lack Article III standing to litigate their Section 43(a) and their Delaware deceptive trade practices claims.9

_____

9. In their reply brief, the plaintiffs offer another theory for their Article
III standing to bring the false advertising and false designation of origin

19

IV.

Moreover, even if the plaintiffs' Section 43(a) claims meet
the standing requirements of Article III, they cannot satisfy
the demands of prudential standing. "Prudential standing
`consists of a set of judge-made rules forming an integral
part of "judicial self-government.' "" Gen. Instrument Corp. of
_____

claims. The plaintiffs argue that they possess a"right of association"
with the original P.A. Smirnov (a right originally held by Eugenia, then
passed through descent to Boris Alexandrovitch Smirnov, and finally
transferred by Boris to the plaintiffs), independent of any common law
trademark rights in the Smirnoff or Smirnov name or marks, and that
the defendants' false advertising has caused the plaintiffs injury by
interfering with this right of association.

For support, the plaintiffs analogize this case to Cairns v. Franklin Mint
Co., 24 F. Supp. 2d 1013 (C.D. Cal. 1998), aff 'd, 1999 WL 12780044
(9th Cir. 2000), in which a District Court held that the executors of the
estate of the late Princess Diana stated a claim under Section 43(a) for
false celebrity endorsement against the Franklin Mint and others who
sold merchandise (such as porcelain dolls, rings, and plates) that bore
Princess Diana's likeness or name. The district court understood the
plaintiffs' chief argument to be that the defendants' use of the likeness
and name was likely to lead consumers to believe that the executors
were endorsing the defendants' products, and held that the executors
had standing in their own right to bring their Section 43(a) claim against
the defendants. See id. at 1032-33.

Because the plaintiffs in the present case did not develop this
argument until their reply brief, we do not regard it as properly before
us. See Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp., 26 F.3d
375, 398 (3d Cir. 1994)("An issue is waived unless a party raises it in
its
opening brief. . . ."). But even if it were before us, it would not
persuade
us that the plaintiffs have standing. Even were we to assume arguendo
that the plaintiffs possessed such "right of association" with P.A.
Smirnov, and that the defendants' allegedly false advertising interfered
with that right by preventing the plaintiffs from using the Smirnov or
Smirnoff name and marks in the United States market, we would still
conclude that the plaintiffs failed to establish the requisite causal
connection between the plaintiffs' asserted injury and the defendants'
challenged conduct. The plaintiffs have not pointed to evidence that is
sufficient to show that they would be able to market their vodka in the
United States under the Smirnov name were it not for the consuming
public's mistaken belief, fostered by the defendants' false advertising,
that either the plaintiffs (or P.A. Smirnov, or the French Smirnovs)
endorsed the defendants' product.

20

Del. v. Nu-Tek Elecs. & Mfg., Inc., 197 F.3d 83, 87 (3d Cir. 1999) (quoting Conte Bros., 165 F.3d at 225). The requirements of prudential standing serve "to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim." Conte Bros., 165 F.3d at 225 (quoting Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 804 (1985)).

"Where Congress has expressly conferred standing by statute, prudential standing concerns are superseded." Gen. Instrument, 197 F.3d at 87 (citing Warth, 422 U.S. at 501). However, "Congress is presumed to incorporate background prudential standing principles, unless the statute expressly negates them." Conte Bros. , 165 F.3d at 227 (citing Bennett v. Spear, 520 U.S. 154, 164 (1997)). Here, these "background prudential standing principles" apply, since "Congress did not expressly negate[the] prudential standing doctrine in passing the Lanham Act." Conte Bros., 165 F.3d at 227.

In Thorn v. Reliance Van Co., 736 F.2d 929 (3d Cir. 1984), we addressed Section 43(a)'s prudential standing requirements for the first time. We held that a party has prudential standing to bring a claim under Section 43(a) if the "party has a reasonable interest to be protected against false advertising." Thorn, 736 F.2d at 933. In later cases, we "grappled with defining the term [reasonable interest] with greater precision." Conte Bros., 165 F.3d at 231; see, e.g., PDK Labs., Inc. v. Friedlander, 103 F.3d 1105, 1111 (3d Cir. 1991) (applying a two-pronged reasonableness test for S 43(a) prudential standing).

In Conte Bros., 165 F.3d at 233, we adopted the test for antitrust standing articulated by the Supreme Court in Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519 (1983) [hereinafter, AGC]. Under this test, a court called upon to decide whether a party has prudential standing under Section 43(a) should consider the following factors:

> (1) The nature of the plaintiff 's alleged injury, i.e., is the injury of a type that Congress sought to redress in providing a private remedy for violations of the Lanham Act?

21

> (2) The directness or indirectness of the asserted injury.
>
> (3) The proximity or remoteness of the party to the alleged injurious conduct.
>
> (4) The speculativeness of the damages claim.
>
> (5) The risk of duplicative damages or complexity in apportioning damages.

Id. at 233 (citations omitted); see, e.g., Unisource Worldwide, Inc. v. Heller, No. Civ. A. 99-266, 1999 WL 374180, at *6 (E.D. Pa. June 9, 1999) (applying the Conte Bros. test); Proctor & Gamble Co. v. Amway Corp., 80 F. Supp. 2d 639, 678-81 (S.D. Tex. 1999) (same). Courts have applied the AGC test on a case-by-case basis, weighing the enumerated factors without giving any one factor determinative weight. See Sullivan v. Tagliabue , 25 F.3d 43, 46 (1st Cir. 1994); Los Angeles Mem'l Coliseum v. NFL, 791 F.2d 1356, 1363 (9th Cir. 1986). After examining and weighing these five factors, we hold that the plaintiffs lack prudential standing under Section 43(a). We discuss each factor below.

A.

Section 43(a) is intended to provide a private remedy "to a commercial plaintiff who meets the burden of proving that its commercial interests have been harmed by a competitor's false advertising." Serbin v. Ziebart Int'l Corp., 11 F.3d 1163, 1175 (3d Cir. 1993). This is not to say that a non-competitor never has standing to sue under this provision; rather, the focus is on protecting "commercial interests that have been harmed by a competitor's false advertising," Granite State Ins. Co. v. Aamco Transmissions, Inc., 57 F.3d 316, 321 (3d Cir. 1995), and "secur[ing] to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not." Conte Bros., 165 F.3d at 234 (quoting S. Rep. No. 1333, 79th Cong., 2d Sess. (1946), reprinted in 1946 U.S.C.C.A.N. 1274, 1275).

In our treatment of constitutional standing, we listed and discussed the numerous forms of injury that the plaintiffs

22

claim to have suffered, and as we noted, those various injuries may be characterized in two ways -- those injuries that are and those that are not dependent on the plaintiffs' inability to use the Smirnov name. We previously pointed out that the injuries in the former characterization are not "fairly traceable" to the conduct on the part of the defendants that forms the basis for the plaintiffs' Section 43(a) claims -- the allegedly false designation of origin and false advertising.

The plaintiffs, however, rely heavily on injuries of this type to support their argument that the first factor of the Conte Bros. test weighs in their favor. The plaintiffs complain that they cannot obtain BATF approval for a vodka label using the Smirnov name and symbols. Brief for Appellants at 32. However, the plaintiffs predict that the BATF will reject this label "because it would infringe Defendants' registered trademarks." Brief for Appellants at 37. Under the first factor of the Conte Bros. test, we must look for an injury that "flows from that which makes defendants' acts unlawful." See Brunswick Corp. v. Pueblo Bowl-O-Mat, 429 U.S. 477, 489 (1977) (An "antitrust injury" must "flow[ ] from that which makes defendants' acts unlawful."). Section 43(a) of the Lanham Act seeks to protect parties against false designation of origin and false advertising. Accordingly, we must look for an injury that was caused by a false designation of origin or false advertising. For this reason, the plaintiffs' purported injury involving the BATF is insufficient to satisfy the first factor of the Conte Bros. test.

The plaintiffs also claim that they are unable to enter into distribution contracts or to advertise their products, but it is apparent that these injuries too result largely, if not entirely, from the defendants' marks and not from their alleged false designation of origin or false advertising. The plaintiffs have not identified evidence showing that their supposed complete inability to enter into distribution contracts or advertise results from the defendants' false association with the original Smirnov trade house or false advertising. On the contrary, the plaintiffs themselves state that distributors have refused to enter into contracts with Joint Stock "for fear of being sued by the Defendants" for trademark infringement. Brief for Appellants at 36.

23

The plaintiffs do allege at least one injury of the type that Section 43(a) is intended to protect. The plaintiffs state:

> Companies such as Plaintiffs that manufacture and distribute Russian vodka are uniquely injured by Defendants' false advertising and designations of origin. The evidence shows that Defendants' wrongdoing has caused consumers to perceive SMIRNOFF vodka to be a Russian product. Any deceived customers who seek to buy Russian vodka are likely to mistakenly purchase Defendants' product only to the detriment of companies like Plaintiffs, which produce true Russian vodka.

Brief for Appellants at 33-34. The plaintiffs correctly note that this injury is "irrespective of their rights to the SMIRNOV name and heritage." See Brief for Appellants at 33. But as we have already discussed, we do not believe that the plaintiffs have shown that they have actually suffered injury of this type or that they face an imminent threat of such injury because the plaintiffs have never manifested an intent to offer their products for sale in the United States market other than under the Smirnov name.

Nevertheless, even if our prior conclusion were incorrect and the plaintiffs had shown at least an "identifiable trifle" of this sort of injury or a sufficient threat of such an injury to satisfy the constitutional requirement of injury in fact, it would not necessarily follow that they have prudential standing as well. Just as "[a]ntitrust injury is a necessary but insufficient condition of antitrust standing," Barton & Pittinos, Inc. v. Smithkline Beecham Corp., 118 F.3d 178, 182 (3d Cir. 1997), the existence of a minimal Lanham Act injury does not alone support a finding of standing. Rather, we must weigh this injury with the other four factors of the Conte Bros. test.

B.

Under the second factor of the Conte Bros. test, we examine the directness or indirectness of the asserted injury. See Conte Bros., 165 F.3d at 234. The issue under this factor is whether the defendants' conduct has had a direct effect on either the plaintiffs or the market in which

24

they participate. See AGC, 459 U.S. at 540–41; Sullivan, 25 F.3d at 51 (examining the directness factor under AGC).

The plaintiffs provided some evidence that the defendants' designation of origin and advertising may have had an adverse impact on Russian vodka producers. There is no doubt that the labels that the defendants affix to their products evoke Russia and could convey the impression that the defendants' vodka is the same as or similar to the vodka that was purveyed to the Russian court and won international competitions prior to the revolution. J.A. at 659 & 708 & 711 (Smirnoff labels). In addition, the plaintiffs submitted a study showing that only 37% of American vodka drinkers identify Smirnoff as an American brand, while 23% of vodka drinkers believe that Smirnoff is made in Russia. Moreover, the study found that 27% of Smirnoff drinkers believe that it is a Russian brand, while only 33% of sub-premium vodka drinkers can correctly identify Smirnoff as an American label. J.A. at 3116. This evidence could support a finding that the defendants have misled consumers regarding the origin and nature of their products and have detracted from the "reputation or good will" of importers of Russian vodka. See Conte Bros., 165 F.3d at 234.

As noted, however, the plaintiffs have not and do not import Russian vodka and apparently do not intend to do so unless they are able to use the Smirnov mark. While an importer of Russian vodka could claim that the defendants' activities directly lowered its sales and profits, the plaintiffs' position is more attenuated. They complain that the defendants' false designation of origin and false advertising have made the American market less profitable for importers of Russian vodka; that this has made distributors less willing to import Joint Stock's product; and that this has contributed to Joint Stock's failure to send any vodka to the United States. Seen in this light, Joint Stock's injury is not direct enough to weigh in favor of prudential standing under the Lanham Act.

C.

The third factor is the proximity of the plaintiff to the allegedly harmful conduct. See Conte Bros., 165 F.3d at

25

233. Our task here is to determine whether there is "an identifiable class of persons whose self-interest would normally motivate [them] to vindicate the public interest" by bringing an enforcement action. AGC, 459 U.S. at 542; accord Conte Bros., 165 F.3d at 234. The existence of such a class "diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general." AGC, 459 U.S. at 542.

Russian vodka manufacturers who are currently exporting their products to the United States form such an identifiable class, and all manufacturers currently selling vodka products in the United States constitute another such class. Both of these groups of manufacturers are more proximate to the claimed injury here, which has occurred in the American vodka market.

The Second Circuit faced a similar situation in Havana Club Holding, S.A. v. Galleon, S.A., 203 F.3d 116 (2d Cir. 2000). There, a Cuban manufacturer of rum, Havana Club Holding, S.A. ("HCH"), filed suit against Bacardi & Co. ("Bacardi"), the American manufacturer of "Havana Club" rum. HCH claimed that Bacardi falsely designated its rum's origin as Cuban. However, HCH did not compete with Bacardi in the United States because of the Cuban trade embargo. In holding that HCH did not have standing to pursue its Lanham Act claims, the Second Circuit relied in part on the ability of "[a]ny rum producer selling its product in the United States" to "obtain standing to complain about Bacardi's allegedly false designation of origin." Havana Club, 203 F.3d at 134. Similarly, in this case, any vodka producer selling its products in the United States could challenge the defendants' activities and would have a stronger commercial interest to protect than do the defendants, making it more appropriate for them to act as "private attorney generals."[10]

---

10. In weighing this factor, we do not impose a requirement that plaintiffs "be United States competitors to have standing," as the plaintiffs misconstrue the District Court's opinion as holding. Compare Brief for Appellants at 42 with Joint Stock Soc'y, 53 F. Supp. 2d at 710. Rather, we take into account the premise implicit in the AGC and Conte Bros. test that a direct competitor will usually have a stronger commercial interest than a non-competitor.

26

We realize that the plaintiffs have taken some steps in preparation for possibly marketing Joint Stock's products in this country. Joint Stock has organized RASCO as the exclusive licensee and distributor of its vodka in the United States and has hired a market consultant. Joint Stock has also issued a press release, created a label, and solicited contracts. The plaintiffs argue that they cannot take further steps to enter the market because of the very activity that they seek to enjoin. However, the plaintiffs again confuse injuries traceable to the defendants' marks with injuries traceable to the defendants' alleged false designation of origin and false advertising. As we have observed, according to the plaintiffs, distributors refuse to enter into contracts with Joint Stock because they fear being sued by the defendants for trademark infringement. See Brief for Appellants at 36. Joint Stock could presumably circumvent this problem by simply importing vodka into the United States under a different name. Thus, faulting Joint Stock because it is not more closely associated with the American market is not, as the plaintiffs claim, "ask[ing] Plaintiffs to do the impossible." Brief for Appellants at 37.

D.

The fourth factor, the speculative nature of the plaintiffs' damages, also weighs against prudential standing. Because the plaintiffs have never sold or attempted to sell their vodka in the United States, any attempt to calculate lost sales or profits would be highly speculative.

Attempting to circumvent this problem, the plaintiffs assert that they advanced the following three theories of damages that would not have required speculation: (1) a reasonable royalty for the defendants' use of the Smirnov name since 1939; (2) the costs of a corrective advertising campaign; and (3) disgorgement of the defendants' profits since 1982. See Brief for Appellants at 42. We do not agree that the plaintiffs' request for these forms of relief causes the fourth factor to weigh in their favor.

First, it is not clear that an award of royalties for the use of the Smirnov name since 1939 would be a proper remedy for the false designation of origin and false advertising

27

claims that the plaintiffs asserted under Section 43(a). In every case cited by the plaintiffs in which royalties were awarded, the owner of a patent or trademark sued for infringement. See Sands, Taylor & Wood Co. v. Quaker Oats Co., 34 F.3d 1340, 1351 (7th Cir. 1994) (trademark infringement); Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 964 (7th Cir. 1992) (same); Proctor & Gamble Co. v. Paragon Trade Brands, Inc., 989 F. Supp. 547, 607-14 (D. Del. 1997) (patent infringement). Moreover, in their briefs on appeal, the plaintiffs have made little attempt to show that they have a right to the use of the Smirnov or Smirnoff marks in this country. The plaintiffs have not attempted to answer the defendants' argument that trademark rights are territorial; that, whatever rights the plaintiffs and the French Smirnovs may have to use the family name elsewhere, they have never had any trademark rights in this country; and that even if they had trademark rights in this country prior to the Russian Revolution,[11] those rights were long ago abandoned.

As for the remaining theories of damages -- disgorgement of profits and the cost of a corrective advertising campaign -- it appears that any party with standing could request these forms of relief. Disgorgement of profits "initially developed as a remedy to provide a plaintiff with relief in equity, to serve as a proxy for damages, or to deter the wrongdoer from continuing his violations" and "is most appropriate if damages are otherwise nominal." BASF Corp. v. Old World Trading Co., 41 F.3d 1081, 1095-96 (7th Cir. 1994); see also Playboy Enters., Inc. v. Baccarat Clothing Co., 692 F.2d 1272, 1274 (9th Cir. 1982). Similarly, a corrective advertising campaign could presumably be sought by any party no matter how situated.

If a request for relief that may be sought by any party sufficed under the fourth factor of the Conte Bros. test, that factor would be essentially meaningless, and we refuse to undermine the fourth factor in this way. "The aim of [prudential standing] is to determine whether the plaintiff is `a proper party to invoke judicial resolution of the dispute

---

11. There is some evidence that P.A. Smirnov's trade house shipped a small quantity of vodka to New York before 1917.

28

and the exercise of the court's remedial powers." Conte Bros., 165 F.3d at 225 (quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 546 n.8 (1986)) (emphasis added); see Roger D. Blair & William H. Page, "Speculative" Antitrust Damages, 70 Wash. L. Rev. 423, 425 (1995) (noting that the doctrine of antitrust standing requires an effective mechanism for the proof of individual harm). Therefore, we agree with the District Court that the plaintiffs may not bolster their case for prudential standing by relying on forms of monetary relief that they would receive "as a `vicarious avenger' of the general public's right to be protected against potentially false advertisements." Joint Stock, 53 F. Supp. at 710 (citing Serbin, 11 F.3d at 1175).

The damages that we examine under this factor are those that are particular to the plaintiffs. For example, a plaintiff often will point to its own reduction in sales or loss of profits. See Conte Bros., 165 F.3d at 234; Johnson & Johnson v. Carter-Wallace, Inc., 631 F.2d 186, 190 (2d Cir. 1980) (holding that a Lanham Act plaintiff must show a likelihood of damages from loss of sales). The only damages of that nature that the plaintiffs in this case could claim would be extremely speculative -- namely, the profits that Joint Stock would have made if it had sold its vodka in the United States without using the Smirnov name and had not faced the defendants' allegedly false designation of origin and false advertising. For this reason, the fourth factor weighs against prudential standing.

E.

The final factor under Conte Bros. is the risk of duplicative damages or the complexity of apportioning damages. Damage claims such as those advanced by the plaintiffs may be asserted by at least three groups. Ranked in descending order of proximity to the allegedly unlawful conduct, these groups are: (1) all importers of Russian vodka currently doing business in the United States; (2) all other vodka manufacturers in the American market; and (3) all manufacturers of vodka (including makers of Russian vodka) who, like the plaintiffs, have not entered the United States market but have taken at least minimal preparatory steps for entry. Due to the speculative nature of the

29

damages of parties in the third group, allowing them to sue would create a danger of duplicative damages and thus potentially "would subject defendant firms to multiple liability for the same conduct and would result in administratively complex damages proceedings." Conte Bros., 165 F.3d at 235. Although the plaintiffs correctly note that in Conte Bros. we were disinclined to grant standing to remote parties along the vertical distribution chain, see Brief for Appellants at 46-47, we see no reason why similar concerns should not apply in the admittedly different context here.

F.

To summarize, the plaintiffs may have a minimal commercial interest, but they have at best only a very indirect injury. In addition, they are remote from the asserted injury, their damages claims are highly speculative, and there is a substantial risk of duplicative damages. The Conte Bros. factors counsel strongly against prudential standing. The plaintiffs argue that some of the Conte Bros. factors are suited for use only in considering claims for damages and therefore should not be taken into account or should be discounted in determining whether the plaintiffs have prudential standing with respect to their requests for non-monetary relief. Even if we do this, however, the remaining factors -- most notably, the indirect nature of the plaintiffs' injury and their remoteness from the alleged violations of Section 43(a)-- lead to the same result. We thus hold that the plaintiffs lack prudential standing to assert any of their Section 43(a) claims.12

_____

12. As an alternative basis for the summary judgment grant in the defendants' favor, the District Court held that the plaintiffs' action was barred under the equitable doctrine of laches. Laches bars an action from proceeding if there was (1) an inexcusable delay in bringing suit, and (2) material prejudice to the defendant as a result of the delay. See Pappan Enterp. v. Hardee's Food Sys., 143 F.3d 800, 804 (3d Cir. 1998); accord United States Cellular Inv. Co. v. Bell Atl. Mobile Sys., Inc., 677 A.2d 497, 502 (Del. 1996) (setting forth the same two-prong test under Delaware law).

With respect to the inexcusable delay prong, the District Court noted that the French Smirnovs were aware for over sixty years that the

V.

We likewise hold that the plaintiffs lack standing under
the Delaware Uniform Deceptive Trade Practices Act. A
proper plaintiff under this Act is "[a] person likely to be
damaged by a deceptive trade practice of another." 6 Del.
Code S 2533. The relevant Delaware case law persuades us
that standing under this Act with respect to claims of the
sort advanced by the plaintiffs in this case is no broader
than prudential standing under Section 43(a). See S & R

_____

defendants and their predecessors in interest were producing and selling
vodka in the United States under the Smirnoff label, yet neither
instituted legal action nor provided the defendants or their predecessors
with notice that the French Smirnovs had a potential claim to the marks.
See id. at 713-14. Furthermore, the Court rejected the excuses offered by
the plaintiffs, namely that the French Smirnovs were too destitute, and
too hampered by lack of available documentary evidence establishing
their connection to the original P.A. Smirnov vodka manufacturer, to
pursue their claims against the defendants or their predecessors. See id.
at 715-16. Finally, with respect to the second prong of the laches test,
the Court observed that the defendants' had suffered severe economic
and evidentiary prejudice by the French Smirnovs' sixty-year delay. See
id. at 717-21.

On appeal, the plaintiffs seek to overcome the District Court's powerful
analysis of the laches issue on several grounds. First, the plaintiffs
argue
that it was improper for the Court to impute the French Smirnovs' delay
to the plaintiffs, because the plaintiffs are corporate entities that did
not
come into existence until the early to mid 1990s. Second, even assuming
that the Court's imputation was proper, the plaintiffs argue that the
French Smirnovs' poverty and lack of documentary evidence excuses are
legitimate ones. Third, the plaintiffs claim that the record evidence
raises
a genuine issue as to whether the defendants were prejudiced by the
sixty-year delay. Finally, the plaintiffs point to the equitable nature of
the laches doctrine, assert that the defendants did not act in good faith
in employing the Smirnoff marks (in fact, that they willfully set out to
defraud and deceive the public), and argue that such alleged bad faith
should prevent the laches bar from applying to the plaintiffs' claims.

Because, for the reasons set forth in this opinion, we conclude that the
plaintiffs lack the constitutional and prudential standing necessary to
bring this action against the defendants, we need not reach this
alternative bar to the plaintiffs' claims. Accordingly, we will not
address
the merits of the plaintiffs' challenges to the District Court's laches
analysis.

Assocs., L.P., III v. Shell Oil Co., 725 A.2d 431, 440 (Del. Super. Ct. 1998); Pack & Process, Inc. v. Celotex Corp., 503 A.2d 646, 649 n.1 (Del. Super. Ct. 1985). Consequently, for the reasons already discussed, we hold that the plaintiffs lack standing under the Delaware Act.

VI.

We affirm the order of the District Court dismissing this case.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

32