**In re SPREE.COM CORP., dba e-Value-Plus, dba e-ValuePlus.com, dba e-ValuePlusSolutions, dba e-ValuePlusSolutions.com, Debtor.**

**Marc Tesler, Plaintiff,**

v.

**Certain Underwriters at Lloyd's London, Defendant.**

**Bankruptcy No. 00–34433DWS. Adversary No. 02–0278.**

United States Bankruptcy Court, E.D. Pennsylvania.

June 26, 2003.

---

**6.** The Estate does not elaborate on this highly ambiguous argument.

Michael H. Reed, Henry Dewerth Jaffe, Pepper Hamilton, LLP, Philadelphia, PA, for Debtor.

John Summers, Alan C. Promer, Hangley, Aronchick, Segal, Pudlin, Philadelphia, PA, for Plaintiff.

Patrick K. Cary, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, Philadelphia, PA, for Defendant.

Dave P. Adams, Office of the U.S. Trustee, Philadelphia, PA, United States Trustee.

## OPINION

DIANE WEISS SIGMUND, Bankruptcy Judge.

Before the Court is the Motion of Defendant ACE Global London, individually and as representative of the defendants Certain Underwriters at Lloyd's, London (collectively, "the Underwriters"), for Summary Judgment (the "Motion") and the response thereto and Cross–Motion for Partial Summary Judgment of Plaintiff Marc Tesler (hereinafter "Plaintiff" or "Tesler").[1] For the reasons stated herein,

1. Based upon a conference call with the parties, I ordered a moratorium on further dis-

both motions will be denied. However, based upon the factual record the parties have put before the Court in the context of their respective motions,[2] this adversary action must be dismissed because this Court lacks subject matter jurisdiction.

## FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiff, Tesler, served as a director of Spree.com (the "Debtor") from approximately November 1999 to November 2000, having been appointed to that position by various venture capital entities which had invested in the Debtor (the "Venture Capitalists"). Tesler was also an employee of the Venture Capitalists until his resignation, effective January 31, 2001. On March 15, 2001, the Debtor sued Tesler and the Venture Capitalists in a related adversary proceeding also brought before me, *Cashback Liquidation Co. f/k/a Spree.com v. Tesler*, Adv. No. 01–0161 (the "Cashback Litigation"). The sole claim

against Tesler that survived a motion to dismiss was a claim of breach of his fiduciary duties as a board member of the Debtor.[3] The Cashback Litigation has since been settled.

While the Cashback Litigation was pending, Tesler filed the instant adversary action (hereinafter the "Coverage Action") seeking, *inter alia*, a declaration of rights as a director of the Debtor under a directors and officers liability insurance policy that was issued by the Underwriters to the Debtor (the "Underwriters Policy"). Tesler filed the Coverage Action after the Underwriters denied coverage based upon certain exclusions in the Underwriters Policy. *See Tesler v. Certain Underwriters at Lloyd's,* 2002 WL 1586274 at *1 n. 2 (Bankr.E.D.Pa.2002) (hereinafter "Underwriters I"). Now Tesler seeks a declaration that, pursuant to the Underwriters Policy, the Underwriters are obligated to

covery in this adversary action pending resolution of the Underwriters' Motion. Tesler has combined his anticipated objection to the Motion with his own cross-motion. Having found that further prosecution of a cross-motion was inconsistent with the discovery moratorium, I have stayed the Underwriters' obligation to file a response to Tesler's cross-motion until determination of the Underwriters' Motion. Given the outcome of this contested matter, the cross-motion is moot.

2. Both parties are prone to simply attaching documents to their motions without the proper certifications and/or affidavits necessary to transform the documents into an admissible record. However, "[a]s is true with other material introduced on a summary judgment motion, uncertified or otherwise inadmissible documents may be considered by the court if not challenged." 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 2722, at 384 (1998). Similarly, "[T]he court may consider an insufficient affidavit if there is no objection to it." *Id.* at 379. *Accord In re Unisys Savings Plan Litigation,* 74 F.3d 420, 437 n. 12 (3d Cir. 1996) ("We agree with our . . . sister courts of

appeals that Rule 56 defects are waived where they are not raised in the district court."). Any factual findings herein are based solely upon the portions of the record to which the parties have raised no objection, my own knowledge of the procedural history, or judicially noticeable facts.

Moreover, as all of the relevant documents appear to be duplicated as exhibits to the memoranda of both the Underwriters and Tesler, for ease of reference all exhibit citations shall refer to the exhibits and declarations appearing in Plaintiff's Compendiums I through III unless otherwise noted.

3. I shall take judicial notice of the docket entries in this adversary action, the Cashback Litigation, and the Debtor's bankruptcy case. Fed.R.Evid. 201, incorporated in these proceedings by Fed.R.Bankr.P. 9017. *See Maritime Elec. Co., Inc. v. United Jersey Bank,* 959 F.2d 1194, 1200 n. 3 (3d Cir.1991); *Levine v. Egidi,* 1993 WL 69146, at *2 (N.D.Ill.1993); *In re Paolino,* 1991 WL 284107, at *12 n. 19 (Bankr.E.D.Pa.1991); *see generally In re Indian Palms Associates, Ltd.,* 61 F.3d 197 (3d Cir.1995).

pay his legal fees in the Cashback Litigation.

▮▮▮ The Underwriters initially filed a motion to dismiss the Coverage Action, asserting *inter alia,* lack of subject matter jurisdiction and lack of a ripe controversy (the "Dismissal Motion"). I granted the Dismissal Motion in part, finding Count II of the Complaint to be premature. *Underwriters I* at *4–5. However, I rejected the jurisdictional argument espoused by the Underwriters. Applying the universally accepted measure of "related to" jurisdiction enunciated by the Third Circuit Court of Appeals in *Pacor v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984)—*i.e.,* that subject matter jurisdiction exists where the outcome of the adversary proceeding could *conceivably* have an effect on the debtor's estate [4]—I noted that the Debtor's by-laws (the "By–Laws") require it to indemnify its officers in certain situations. Based upon the By–Laws, Tesler had filed a proof of claim in the Debtor's bankruptcy case for his legal expenses incurred in the Cashback Litigation.[5] *Underwriters I* at *2. To the extent that Tesler might recover under the Underwriters Policy, such recovery would reduce his claim against the estate, thus creating a sufficient jurisdictional nexus under *Pacor. Id.*

This jurisdictional determination was based upon the facts pled in the Coverage Action Complaint which I was required to assume as true on a motion to dismiss—namely that Tesler was incurring and paying his own defense costs in the Cashback Litigation. Compl. ¶ 63. It thus appeared that his proof of claim for indemnification against the estate asserted a real and tangible claim which could in fact be reduced by a recovery in this adversary proceeding.

However, discovery has revealed the undisputed fact that Tesler has *not* personally paid any of his defense costs in the Cashback Litigation or the present Coverage Action, nor has he ever had any obligation to do so. Tesler ended his employment with the Venture Capitalists prior to the commencement of the Cashback Litigation. His termination is governed by a separation agreement between Tesler and the Venture Capitalists, whereby the Venture Capitalists agreed to, in relevant part:

> indemnify and defend Tesler to the extent permitted by law as to any claim brought against him with respect to his actions arising out of his performance ... as a [Venture Capitalist] representative on the board of directors of any Portfolio Company

Exhibit D (the "TCV Separation Agreement"), at ¶ A.6.[6]

---

**4.** A proceeding is related to bankruptcy if *"the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy."* In re Marcus Hook Development Park, Inc. 943 F.2d 261, 264 (3d Cir. 1991) (*quoting Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984) (emphasis in original)). Bankruptcy jurisdiction will exist so long as it is possible that a proceeding may impact on "the debtor's rights, liabilities, options, or freedom of action" or the "handling and administration of the bankruptcy estate." *Marcus Hook,* 943 F.2d at 264 (*quoting In re Smith,* 866 F.2d 576, 580 (3d Cir.1989)). *See also Walnut Associates,* 164 B.R. at 491 (*quoting Pacor,* 743 F.2d at 994) ("Bankruptcy

jurisdiction pursuant to section 1334(b) ... extends to proceedings that 'could conceivably have any effect on the estate being administered' ").

**5.** Tesler filed his proof of claim on May 22, 2001, shortly after the inception of the Cashback Litigation. He supplemented it on February 19, 2003, the last allowable date to file a proof of claim, by fixing the amount of legal fees "incurred" in that litigation.

**6.** A "Portfolio Company" is any company in which the Venture Capitalists have an investment, including the Debtor. Exhibit D at ¶ B.7.

Additionally, discovery has revealed that the Venture Capitalists hold their own liability policy with the Hartford Pacific Insurance Company (hereinafter the "Hartford" and the "Hartford Policy"). Exhibit L. Tesler is an "Insured" as defined by the Hartford Policy. *Id.* at §§ IV(E)-(F). After the Underwriters denied Tesler's request for coverage, the Venture Capitalists turned to the Hartford. Declaration of Robert Bensky ("Bensky Dec.") ¶ 7.[7]

While they sought interim funding from the Hartford, the Venture Capitalists engaged legal counsel for themselves and Tesler in the Cashback Litigation. *Id.* at ¶ 4. The Venture Capitalists began paying those legal expenses related to the Cashback Litigation at least as of May 2002, nine months before the Coverage Action was initiated and his proof of claim was liquidated. Bensky Decl. ¶ 8; Exhibit 6 to the Motion.[8] Thus, it is undisputed that before Tesler ever filed the Coverage Action against the Underwriters, his legal expenses were in fact being paid by the Venture Capitalists, as is required under the TCV Separation Agreement. The Hartford subsequently reimbursed the Venture Capitalists and now continues to advance Tesler's legal expenses.[9] Exhibit M (Hartford check payable to the Venture Capitalists dated August 21, 2002); Bensky Dec. ¶¶ 12–13.

The Underwriters filed the Motion based upon this discovered information. The gist of its argument is that Tesler has not and will never be required to pay his legal expenses. He has not therefore suffered a "loss" as defined in the Underwriters Policy. Tesler counters that (1) the Hartford's liability is merely as an excess insurer, *i.e.,* it is secondary to the Underwriters' liability; and (2) that the Hartford payments are a conditional "loan" that will have to be repaid if it turns out that the Underwriters are in fact responsible for his expenses. The Hartford itself has not asserted a position as to the nature of its payments, either by affidavit, motion to intervene in this action, or a declaratory action of its own seeking a determination of primary liability.

Without addressing the merits of the Coverage Action, the more relevant issue to the Court is whether my prior finding of "related to" jurisdiction is altered by these subsequently discovered events. Given that one or both insurance companies will ultimately be responsible for Mr. Tesler's expenses and that the Venture Capitalists have insulated his liability for defense costs through the TCV Separation Agreement, what conceivable effect could the Coverage Action have on the administration of the Debtor's estate? I posed this question to the parties at the hearing on the Motion, as it was clear from their memoranda that they had not considered the issue. Having given the parties the opportunity to supplement their memoranda to address this Court's jurisdiction, this threshold issue is now ready to be decided.

## DISCUSSION

■ I begin by noting that my prior finding of subject matter jurisdiction is not dispositive. A bankruptcy court, like any federal court, is a court of limited jurisdic-

---

7. Mr. Bensky is the Chief Financial Officer of the Venture Capitalists. *Id.*

8. This is a summary of payments received by Howard, Rice, Nemerovski, Canady, Falk & Rabkin ("Howard Rice"), showing payment by the Venture Capitalist beginning May 25, 2001. Tesler has not objected to this exhibit.

*See Supra* n. 2. Howard Rice was the first law firm hired by the Venture Capitalists to defend Tesler. Bensky Dec. ¶ 4.

9. As will be discussed below, the terms under which the Hartford is paying are in dispute. *See infra,* § I.A.

tion. Federal courts are limited by Article III of the United States Constitution to only adjudicate actual "cases" and "controversies." *See e.g., Pic–A–State Pa., Inc. v. Reno,* 76 F.3d 1294, 1297 (3d Cir.1996). Bankruptcy court jurisdiction is further limited to four types of title 11 matters upon referral from the district court: (1) cases under title 11, (2) proceedings arising under title 11, (3) proceedings arising in a case under title 11, and (4) proceedings related to a case under title 11. *In re Marcus Hook Development Park, Inc.,* 943 F.2d 261, 264 (3d Cir.1991) (citations omitted). Bankruptcy courts, like any federal court, are obliged to raise *sua sponte* their subject matter jurisdiction. *See, e.g. In re Greene,* 1999 WL 761091 at *3 (E.D.Pa. 1999); *In re G.T.L Corp.,* 211 B.R. 241 (Bankr.N.D.Ohio 1997); *In re Anderson,* 129 B.R. 44, 48 (Bankr.E.D.Pa.1991). Indeed, this duty is explicitly stated both by statute, 28 U.S.C. § 157(b)(3),[10] and by the procedural rules binding this Court. *See* Fed.R.Civ.P. 12(h).[11]

Tesler cites several cases to support the proposition that subsequent events since the filing of the complaint in the Coverage Action cannot divest this court of "related to" jurisdiction. *See Freeport–McMoRan, Inc. v. K N Energy, Inc.,* 498 U.S. 426, 111 S.Ct. 858, 112 L.Ed.2d 951, (1991) ("We have consistently held that if [diversity] jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events.");[12] *Matter of Lemco Gypsum, Inc.,* 910 F.2d 784, 788 n. 20 (11th Cir.1990) ("related to" bankruptcy jurisdiction should be determined as of the time the complaint was filed). The Underwriters counter with the statements made by the Third Circuit Court of Appeals in *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.,* 101 F.3d 1492, 1503 (3d Cir. 1996): "The rule that jurisdiction is assessed at the time of the filing of the complaint has been applied only rarely to federal question cases. Moreover, in these rare cases, the rule has often been applied axiomatically, without extensive discussion or analysis." The Underwriters also cite to several cases for the proposition that "related to" jurisdiction can indeed lapse when a proceeding no longer affects property of the estate. *See, e.g. In re Hall's Motor Transit Co.,* 889 F.2d 520 (3d Cir. 1989) (sale of debtor's property divested bankruptcy court of jurisdiction to adjudicate injunction suit between non-debtor purchaser and municipality).

■ I find that the Underwriters have the better argument in terms of whether "related to" jurisdiction can *exist* when there is no longer any conceivable effect on the estate. The Third Circuit has clearly recognized that "related to" jurisdiction is the most tenuous type of bankruptcy jurisdiction, requiring at minimum some nexus to the bankruptcy estate, and that such

---

**10.** "The bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11." 28 U.S.C. § 157(b)(3).

**11.** Rule 12, made applicable in adversary proceedings by Fed. R. Bankr.P. 7012, states in relevant part: "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." *Id.*

**12.** This statement has been disregarded as dicta by numerous courts and/or limited to holding that the substitution of parties under Fed.R.Civ.P. 25 cannot destroy diversity jurisdiction. *See e.g., Estate of Alvarez v. Donaldson Co., Inc.,* 213 F.3d 993, (7th Cir.2000); *Cobb v. Delta Exports, Inc.,* 186 F.3d 675, (5th Cir.1999); *Bishop v. Moore,* 2000 WL 246583 (D.Kan. Feb 04, 2000).

nexus can be broken by subsequent events such as dismissal of the bankruptcy case. *Smith v. Commercial Banking Corp.(In re Smith)*, 866 F.2d 576, 579 (3d Cir.1989).

■ More importantly, however, and as noted by the Third Circuit Court of appeals in *State Farm Mut. Auto. Ins. Co. v. Powell*, 87 F.3d 93, 97 (3d Cir.1996) (discussing diversity jurisdiction): " '[a] distinction must be made ... between subsequent events that change the [jurisdictional basis] and subsequent *revelations* that, in fact, the required [jurisdictional basis] was or was not in [existence] at the commencement of the action.' " *Id.* (*quoting Jones v. Knox Exploration Corp.*, 2 F.3d 181, 182–83 (6th Cir.1993) (emphasis in original)). As will be discussed below, here it is not subsequent events that divest this court of jurisdiction, but rather the subsequent revelation of facts that were in existence when the Coverage Action was commenced that show jurisdiction was lacking at the proceeding's inception. With this background, I now address the arguments raised by the parties in response to my question.

## I.

■ As I noted in *Underwriters I*, the underpinning of this court's "related to" jurisdiction was Tesler's proof of claim in the Debtor's bankruptcy case, which had a very conceivable effect on the estate when it appeared that Tesler had incurred and/or was paying his legal fees and could therefore seek indemnification under the By-laws. At this point, however, it appears that his proof of claim cannot affect the estate because his legal fees have been paid by the Hartford and in any case he has been indemnified by the Venture Capitalists pursuant to the TCV Separation Agreement. Clearly Tesler cannot recover twice for his legal fees. *See e.g. U.S. v. Occidental Chemical Corp.*, 200 F.3d 143, (3d Cir.1999) (A plaintiff is entitled to only one satisfaction for his loss); *Laventhold & Horwath v. Dependable Ins. Assoc.*, 396 Pa.Super. 553, 579 A.2d 388, 391 (1990) (an insured may pursue a cause of action against two possible insurers, but he can only have one satisfaction of his claim).

### A. Tesler's Repayment Obligations

However, Tesler contends that the Debtor's estate is still affected by his proof of claim because the payments made by the Hartford are not payments, but merely a conditional loan subject to repayment.[13] Tesler alleges that in July 2002, he and the Venture Capitalists entered into an Interim Non–Waiver and Defense Funding Agreement (the "Interim Funding Agreement") with the Hartford, whereby the Hartford merely agreed to "loan" him the legal fees, subject to the condition that he

**13.** Specifically, Tesler invokes the "loan receipt doctrine," which originated in *Luckenbach v. W.J. McCahan Sugar Refining Co.*, 248 U.S. 139, 39 S.Ct. 53, 63 L.Ed. 170 (1918), where a shipper of sugar sued the carrier for the loss of his shipment. The carrier objected to the lawsuit on the basis that the shipper had already been paid for his loss by his insurer. The shipper, however, had entered into a "loan receipt" agreement with the insurer whereby the insurer "loaned" the shipper money to reimburse him for his loss, subject to the condition that the shipper would institute suit against the responsible party and prosecute the claim at the expense and under the control of the insurer. *Id.* at 147, 39 S.Ct. at 54–55. The Supreme Court found this to be a perfectly acceptable solution to the problem created by provisions in bills of lading that gave carriers the benefit of any insurance effected by the shipper and effectively extinguished the insurers's normal subrogation rights against the carrier. *Id.* at 146, 39 S.Ct. at 54. *See also Arabian American Oil Co. v. Kirby & Kirby, Inc.*, 171 Pa.Super. 23, 90 A.2d 410, 412 (1952) (following *Luckenbach* ).

recover those funds in the bankruptcy proceeding and repay to the Hartford any funds recovered. He points to Paragraph 3 of the Interim Funding Agreement:

> Tesler shall, if he has not already done so, file a proof of claim in the pending *In re Spree.com Corp* bankruptcy proceeding in which he asserts an entitlement to indemnification of defense expenses incurred in connection with the [Cashback Litigation].

Exhibit J at ¶ 3. Thus, argues Tesler, the Interim Funding Agreement contemplates that, if his suit against the Underwriters is unsuccessful, he will have to turn to the Debtor's estate to repay the Hartford.

The Underwriters object to the admissibility of Exhibit J as evidence of an agreement with the Hartford because it lacks any signature on behalf of the Hartford. I agree. There is no affidavit or testimony from a representative of the Hartford to authenticate or verify the Hartford's acceptance of the Interim Funding Agreement. Tesler argues that the payment tendered by the Hartford is evidence of the Hartford's acceptance of the Interim Funding Agreement. Exhibit M (check dated August 8, 2002). However, it is equally plausible that Hartford's payment evidences Hartford's acceptance that it is the primarily liable insurer. Absent an affidavit or other evidence from the Hartford, the nature of the payment is pure speculation.

However, even assuming that the Interim Funding Agreement evidences a binding obligation on the parties thereto, Tesler's assertion of a repayment obligation is only partially correct. The relevant repayment language of the Interim Funding Agreement states:

> Tesler and the [Venture Capitalists] acknowledge their respective obligations, pursuant to Section III.(C) of the Policy, to repay to [the Hartford] any and all Claims Expenses paid on their behalf ... if it is subsequently and finally established that such Claims Expenses are not covered under the Policy.

Exhibit J at 2, ¶ 4. Turning to the referenced § III.(C) of the Hartford Policy, that provision states in relevant part:

> Subject to Section VII of this Policy[14], the Insurer shall advance on behalf of the Insureds Claims Expenses which the Insureds have incurred in connection with Claims made against them, prior to disposition of such claims, provided always that to the extent it is finally established that any such Claims Expenses are not covered under this Policy, the Insureds, as appropriate, agree to repay the Insurer such non-covered Claims Expenses.

Exhibit L, § III.(C).

Without regard to the fact that it is the Venture Capitalists who have undertaken to repay Hartford on Tesler's behalf, repayment is required only if it is demonstrated that the Hartford Policy does not cover Tesler's Claims Expenses.[15] This, in

---

**14.** Section VII deals with agreements between the insurer and insured to allocate loss that is both covered and not covered by the Hartford Policy. There is no indication that this section has any applicability here.

**15.** For this reason, I also find it unlikely that the Interim Funding Agreement meets the requirements of a "loan receipt agreement," the legal premise upon which Tesler supports his claim. The agreements in the cases cited

by Tesler, to the extent that the language of the agreements was included in the opinion, all show that loan receipt agreements have at a minimum the following characteristics: (1) they clearly characterize the payment as a loan rather than payment under the policy; (2) they require the insured to institute an action against the liable party; (3) they require the insured to repay the insurer only to the extent he recovers something in the lawsuit; and (4) they require the lawsuit to be

turn, means that there are two possible outcomes of the Coverage Action, neither of which could affect the Debtor's estate *vis a vis* Tesler's proof of claim.

If Tesler is successful in the Coverage Action, *i.e.*, he proves that the Underwriters Policy covers some or all of his legal expenses then Hartford is liable only as an excess insurer pursuant to § I.(C) of the Hartford Policy:

> (C) Portfolio Company Outside Directorship Liability
>
> Subject to this Policy's terms and conditions, the Insurer will pay on behalf of the Insured Persons Loss *in excess of any Portfolio Company Indemnification and Insurance* which the Insured Persons become legally obligated to pay as a result of a Claim . . .

Exhibit L, § I.(C) (emphasis added). Under this scenario, the Underwriters is responsible for all of Tesler's legal fees or there will be an apportionment between the Underwriters and Hartford if Tesler's legal fees exceed the Underwriters' limits of liability, reducing the amount that the Hartford should have paid. Thus, while some repayment obligation to the Hartford may be triggered, Tesler would satisfy this obligation with money from Underwriters as opposed to pursuing his claim against the Debtor's estate.

If Tesler loses the Coverage Action, *i.e.*, the Underwriter's Policy does *not* cover his legal expenses, then the Hartford Policy steps up as primary insurer pursuant to § I.(B)(1) of the Hartford Policy:

> (B) Insured Organization Liability
>
> *Loss not otherwise covered under Section I.(C)* which the Insured Persons become legally obligated to pay as a result of a Claim and for which the Insured Organization has, to the extent permitted or required by law, indemnified such Insured Persons.

Exhibit L at § I.(B)(1) (emphasis added). Thus, under this scenario, the Hartford's payments are covered Claims Expenses, and no repayment obligation is triggered. Tesler's proof of claim, being satisfied by the Hartford, has no effect on the Debtor's estate.

### B. The Possibility of Subrogation Claims by Third-Parties

Tesler alternatively asserts that either the Venture Capitalists and/or the Hartford could "step into his shoes" through subrogation principles and assert his proof of claim to recoup this money from the estate.[16] While I agree that subrogation is

---

maintained at the expense and exclusive control of the insurer. *Luckenbach,* 248 U.S. at 147, 39 S.Ct. at 55; *Petition of J.E. Brenneman Co.,* 322 F.2d 846, 851(3d Cir.1963) (loan agreement attached to opinion as appendix); *White Hall Building Corp. v. Profexray Div. of Litton Indus.,* 387 F.Supp. 1202, 1203 (E.D.Pa.1974). *Accord Oliver B. Cannon and Son, Inc. v. Fidelity and Cas. Co. of New York,* 519 F.Supp. 668, 676 (D.Del.1981) (discussing generally the characteristics of loan receipt agreements). Here, the Interim Funding Agreement does not characterize the Claims Expense advances as a loan. To the contrary, Claims Expense advances are required under the Hartford Policy itself. Nor does the agreement require Tesler to institute action against the responsible party, at the expense and control of the Hartford, and pay Hartford from such recovery. The Interim Funding Agreement required him to do nothing more than submit his proof of claim, something he had already done. It does not even require Tesler to repay the Hartford from any payment on the claim by the Chapter 7 Trustee. Tesler has simply not shown the applicability of this doctrine to these facts.

16. Clearly this possibility only arises if the Coverage Action is *unsuccessful.* If the Underwriters Policy is proven to provide coverage, any subrogation claim would be asserted against the Underwriters, not the Debtor's estate. *See Greater New York Mutual Ins. Co. v. North River Ins. Co.,* 85 F.3d 1088 (3d Cir.1996) ("An insurer, including an excess

the only vehicle by which these entities could assert Tesler's claim,[17] such a possibility is too far removed from this proceeding to support "related to" jurisdiction.[18]

■ *Pacor* only requires that the Coverage Action have a "conceivable" effect on the Debtor's estate, but there must nevertheless be a sufficient nexus between the two. As recently clarified by the Third Circuit Court of Appeals in *In re Federal–Mogul Global, Inc.*, 300 F.3d 368 (3d Cir. 2002): "The test articulated in *Pacor* ... inquires whether the allegedly related lawsuit would affect the bankruptcy proceeding *without the intervention of yet another lawsuit.*" *Id.* at 382 (emphasis added). In *Federal–Mogul*, the debtor was the manufacturer of asbestos products. The defendants in thousands of separate state court personal injury cases arising out of asbestos exposure from friction products such as brake pads (the "Friction Product Defendants") tried to have their cases removed to the bankruptcy court where Federal–Mogul's Chapter 11 case was pending. The Friction Product Defendants' argument for "related to" jurisdiction was that they could and would seek indemnification from Federal–Mogul and thus affect the estate. The Third Circuit Court of Appeals pointed out that in *Pacor*, "related to" jurisdiction was lacking for precisely this reason: "the outcome of [the Higgins–Pacor] lawsuit could not result 'in even a contingent claim' against the debtor (Manville); rather 'an entirely separate proceeding to receive indemnification' would have been required." *Id.* at 382.[19] Similarly, the Third Circuit found that any impact upon the Federal–Mogul estate would require separate indemnification suits against Federal–Mogul. *Id.* at 382.

■ Under Pennsylvania law, the doctrine of subrogation is an equitable one, regardless of any contractual provision. *Zurich–American Insurance Co. v. Eckert*, 770 F.Supp. 269, 272 (E.D.Pa.1991) (*citing Associated Hospital Service v. Pustilnik*, 497 Pa. 221, 439 A.2d 1149 (1981)).[20] I must disagree with Tesler's assumption that the Venture Capitalists or the Hartford have automatically become subrogated to his claim by payment of his legal fees. To the contrary, subrogation is not self-executing. Rather, it is a right which must be pursued with "reasonable diligence" by the alleged subrogee or lost. *Boeing Helicopters v. Workers' Compensation Appeal Board*, 713 A.2d 1181, 1186 (Pa.Commw.1998).[21] Moreover, a claimant

insurer, upon discharging an insured's liability, can become equitably subrogated and may assert its insured's claims against ... a primary insurer").

**17.** The Debtor's indemnification duty under the By–Laws is to Tesler alone. Any claim under the Debtor's By–Laws by the Venture Capitalists and/or the Hartford would have to be through an equitable subrogation of Tesler's rights.

**18.** For this reason, I do not address the Underwriters' contention that Tesler has not shown that the requirements for subrogation have been met. As discussed below, the issue of subrogation is not yet ripe and would require another proceeding.

**19.** In *Pacor*, John and Louise Higgins sued non-debtor Pacor for work-related injuries caused by asbestos exposure. Pacor had filed a third-party complaint against Johns–Manville, who subsequently filed for Chapter 11 relief. *Id.* at 379–80 (discussing facts of *Pacor*).

**20.** As both Tesler and the Underwriters cite to Pennsylvania subrogation law, for the purposes of the Motion I will also assume Pennsylvania law governs.

**21.** As noted by the Pennsylvania Superior Court, what constitutes "reasonable diligence" has not been firmly determined, but stands somewhere between mere notice and an actual lawsuit. *See Harford Mutual Ins. Co. v. Decker*, 1989 WL 79756, at *4 (E.D.Pa.

may avail itself of the remedy of equitable subrogation only after showing: (1) the claimant paid the creditor to protect his own interests; (2) the claimant did not act as a volunteer; (3) the claimant was not primarily liable for the debt; *i.e.,* is only secondarily liable; (4) the entire debt has been satisfied; and (5) allowing subrogation will not cause injustice to the rights of others. *See e.g., Tudor Development Group, Inc. v. U.S. Fidelity & Guar. Co.,* 968 F.2d 357, (3d Cir.1992) (citations omitted).

I fail to see how the above inquiry could be made without the intervention of yet another lawsuit. The sole claims in the Coverage Action are between Tesler and the Underwriters. Thus, the outcome of the Coverage Action between Tesler and the Underwriters would be at best a mere precursor to a separate litigation between the Debtor and the Venture Capitalists and/or the Hartford to determine subrogation rights.[22]

▪ More importantly, subrogation rights do not exist unless asserted by the subrogee. *Boeing Helicopters, supra.* The record is totally devoid of any indica-tion that the Venture Capitalists or the Hartford intend to pursue subrogation rights against the estate, much less that they have exercised reasonable diligence in doing so. Neither has attempted to intervene in this adversary action, nor have they attempted to assert an interest in Tesler's proof of claim such as by seeking to amend the claim or filing a notice of transfer of the claim under Fed. R. Bankr.P. 3001(e). There is not even any evidence that they have notified the Debtor or the Chapter 7 trustee of their intent to seek subrogation rights to Tesler's proof of claim. The complete absence of any attempt by these entities to pursue their alleged subrogation rights strongly belies that they have any real interest in doing so.[23]

## II.

Even without regard to bankruptcy jurisdiction, Tesler faces a fatal impediment to the maintenance of the Coverage Action. As courts created under Article III of the United States Constitution, federal district courts are limited to adjudicating actual "controversies." *Pic–A–State Pa., Inc. v. Reno,* 76 F.3d 1294, 1298 n. 1 (3d

July 7, 1989); *Travelers Ins. Co. v. Hartford,* 222 Pa.Super. 546, 294 A.2d 913, 915 n. 3 (1972). Nor do I have to decide, as there is at this point no evidence of even notice being provided to the estate. *See infra.*

22. Equitable relief such as a declaratory judgment would of course have to be brought by adversary action. *See* Fed. R. Bankr.P. 7001(7). To the extent that Tesler believes he could join these third parties to the Coverage Action pursuant to Fed.R.Civ.P. 17 to assert their subrogation claims, he lacks standing to do so for the reasons discussed below. *See infra* § II.

23. As to the Venture Capitalists, any intention of pursuing subrogation rights is further belied by the documents submitted into the rec-ord. While the Venture Capitalists agreed to indemnify Tesler pursuant to the TCV Separation Agreement, I note that the agreement only requires a reciprocate duty on Tesler's part to:

cooperate with [the Venture Capitalists] in seeking indemnity and a defense under any applicable insurance policy including, but not limited to, any Directors and Officers insurance coverage provided by any Portfolio Company on whose board of directors Tesler sat at the time such action was taken or omitted to be taken.

Exhibit D. § A.6. While it appears that the Venture Capitalists contemplated seeking subrogation from any applicable insurance, it does not appear that they contemplated pursuing subrogation from any portfolio company directly.

Cir.1996).[24] Federal courts have derived several "justiciability" doctrines to determine if there is an actual controversy satisfying constitutional requirements, including standing. *Id.*

■■■ Constitutional standing is concerned with *who* may bring an action to federal court, *i.e.*, does the plaintiff have a personal stake or interest in the outcome to warrant his coming to federal court with his case? *Joint Stock Society v. UDV North America, Inc.,* 266 F.3d 164, 175 (3d Cir.2001).[25] Constitutional standing has three elements, all of which must be met: (1) the plaintiff must have suffered an injury in fact; (2) there must be a causal nexus between that injury and the conduct complained of; and (3) it must be likely that the injury will be redressed by a favorable judicial decision. *Id.* It is always the party invoking federal jurisdiction, in this case Tesler, who bears the burden of establishing these elements. *Id.*

■■■ In the context of the Motion now before me, the Underwriters have contested the first element of standing, namely that Tesler has not suffered an injury in fact. Once standing is called into question at the summary judgment stage, the plaintiff can no longer rely simply on the pleadings, but must set forth evidence proving his standing. *Id.* Here, the evidence placed into the record by Tesler himself establish conclusively that he has not and cannot meet the first element of constitutional standing.

■■■ The declaration of Robert Bensky makes clear that Tesler has not expended a single penny in defending himself in the Cashback Ligation. I have further found that he will never be obligated to do so by virtue of the TCV Separation Agreement. Thus, on this record, Tesler's lack of an injury in fact could not be clearer. Tesler simply has no real stake or interest in the Coverage Action.

■■■ Tesler counters with the argument that he should be allowed to join or substitute the Venture Capitalists and/or the Hartford as real parties in interest under Fed.R.Civ.P. 17,[26] which states in relevant part:

(a) **Real Party in Interest.** Every action shall be prosecuted in the name of the real party in interest. An executor, administrator, guardian, bailee, trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in that person's own name without joining the party for whose benefit the action is brought; and when a statute of the United States so provides, an action for the use or benefit of another shall be brought in the name of the United States. *No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or join-*

---

**24.** The Declaratory Judgment Act, which provides the basis for several of the counts, expressly incorporates the constitutional restrictions upon federal courts to adjudicate only actual controversies: "In a case of actual controversy ... any court of the United States, ... may declare the rights and other legal obligations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

**25.** There is also a "prudential" element of standing consisting of " 'a set of judge-made rules forming an integral part of "judicial self-government." ' " *Id.* (citation omitted). Given that constitutional standing is a threshold issue, that has not been met here, I need not discuss prudential standing.

**26.** This rule made applicable in adversary actions by Fed. R. Bankr.P. 7017.

der or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

Fed.R.Civ.P. 17(a) (emphasis added).

As an initial matter, "[i]t seems almost unnecessary to state that the Federal Rules of Civil Procedure cannot be used to expand the subject matter jurisdiction of the district courts." *Glus v. G.C. Murphy Co.*, 562 F.2d 880, 886 (3d Cir.1977) (*citing* Fed. R. Civ. 82).[27] *See also Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 531 (6th Cir.2002) (*citing* 28 U.S.C. § 2072).[28] If Tesler has no constitutional standing to even enter the realm of the federal courts, it stands *a fortiori* that he also lacks standing to invoke the procedural rules of that realm.

Moreover, Tesler's proposed use of the rule is an impermissible distortion of the Rule's purpose:

> The provision that no action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed, after the objection has been raised, for ratification, substitution, etc., is added simply in the interests of justice. In its origin the rule concerning the real party in interest was permissive in purpose: it was designed to allow an assignee to sue in his own name. That having been accomplished, *the modern function of the rule in its negative aspect is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to*

insure generally that the judgment will have its proper effect as res judicata. ... The provision should not be misunderstood or distorted. It is intended to prevent forfeiture when determination of the proper party to sue is difficult or when an understandable mistake has been made. It does not mean, for example, that, following an airplane crash in which all aboard were killed, an action may be filed in the name of John Doe (a fictitious person), as personal representative of Richard Roe (another fictitious person), in the hope that at a later time the attorney filing the action may substitute the real name of the real personal representative of a real victim, and have the benefit of suspension of the limitation period. *It does not even mean, when an action is filed by the personal representative of John Smith, of Buffalo, in the good faith belief that he was aboard the flight, that upon discovery that Smith is alive and well, having missed the fatal flight, the representative of James Brown, of San Francisco, an actual victim, can be substituted to take advantage of the suspension of the limitation period.*

Fed.R.Civ.P. 17 (advisory committee notes 1966) (emphasis added). Having brought a case into federal court in contravention of the United States Constitution, he cannot now use the federal rules to substitute parties who could have brought the action in the first place.

## CONCLUSION

I have concluded that the Coverage Action is not related to the Debtor's bankruptcy case according to the Third Circuit's articulation of the reach of this

---

**27.** Rule 82 states in relevant part: "These rules shall not be construed to extend or limit the jurisdiction of the United States district courts."

**28.** Congress has also recognized that "[s]uch rules [of practice and procedure proscribed by the Supreme Court] shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b).

Court's subject matter jurisdiction. Nor does this Plaintiff, lacking any injury in fact, have constitutional standing to adjudicate a claim against the Underwriters in any federal court.[29] Finally, I reject Plaintiff's argument that I should retain jurisdiction on the grounds of judicial economy. While the parties have been in this Court for some time now, the pretrial activities they have been engaged in have been collateral to the main issues in the case, and the matter is not ready for trial. More significantly, a court cannot on principles of judicial economy supercede the jurisdictional limitations placed on it by the Constitution and Congress. The Coverage Action will be dismissed with prejudice.

An Order consistent with this Opinion shall be entered.

### ORDER

**AND NOW,** this 26th day of June 2003, upon consideration of the Motion for Summary Judgement (the "Motion") filed by defendant ACE Global London, individually and as representative of the defendants Certain Underwriters at Lloyd's London (collectively, "the Underwriters"), and the objection thereto and Cross–Motion for Partial Summary Judgment (the "Cross–Motion") of Plaintiff Mark Tesler, and after notice and hearing, and for the reasons set forth in the accompanying Opinion;

It is hereby **ORDERED** that:

a. The Complaint is **DISMISSED** with prejudice for lack of subject matter jurisdiction.

b. The Motion and Cross–Motion are **DENIED** as moot.

29. Accordingly, Plaintiff's alternative request that I transfer venue rather than dismiss is rejected. While there may be an unresolved dispute as to which of the insurers, Underwriters or Hartford, is ultimately responsible for the payment of the Plaintiff's legal fees, the appropriate parties are free to pursue that case in the appropriate court.