# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 24, 2011

No. 09-60804

Lyle W. Cayce
Clerk

HAROLD H. HUGGINS REALTY, INC., P.E. TURNER & COMPANY, LTD., RESIDENTIAL APPRAISAL AND CONSULTING, INC., and ALFONSO V. TORRES, d/b/a FRONT DOOR APPRAISALS, individually and on behalf of all others similarly situated,

Plaintiffs-Appellants

v.

FNC, INC.,

Defendant-Appellee

Appeal from the United States District Court
for the Northern District of Mississippi

Before HIGGINBOTHAM, CLEMENT, and OWEN, Circuit Judges

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Four residential real-estate appraisers, seeking to represent themselves and a class of others similarly situated, appeal the district court's determination that they lack prudential standing to sue under the Lanham Act. We conclude that the plaintiffs have pleaded economic injury to a commercial interest caused by the defendant's anti-competitive conduct. Because this is the type of injury Congress intended the Lanham Act to redress, we reverse the judgment of the district court and remand this action for further proceedings.

I.

The plaintiffs appeal the district court's order granting the defendant FNC, Inc. ("FNC")'s motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), so we recite the facts here as the plaintiffs' complaint pleads them.[1] This is a putative class action. Each of the plaintiffs is a residential real-estate appraiser. FNC develops software for use by the mortgage industry. FNC has developed two software platforms that are relevant to this appeal. One is called AppraisalPort; the other is the National Collateral Database.

AppraisalPort is an electronic, Web-based data-transmittal service that functions as a conduit between lending institutions and appraisers. Lending institutions use AppraisalPort to order an appraisal of real estate and to receive a completed appraisal. Appraisers use AppraisalPort to confirm acceptance of an order and to transmit the completed appraisal. After an appraiser performs an appraisal that a lending institution ordered through AppraisalPort, the appraiser enters the appraisal data into an electronic form. AppraisalPort then transmits the appraisal-report data to the lending institution in an industry-standard format. To be able to receive orders for appraisals from lending institutions, appraisers must register with and pay fees to AppraisalPort. The plaintiffs are thus customers of the service FNC offers through AppraisalPort.

FNC's marketing materials for AppraisalPort included a series of representations about the confidentiality of the appraisal-report data that appraisers transmit through the service. FNC repeatedly assured and represented to appraisers that AppraisalPort was secure and private, that only the client lending institution would have access to the data transmitted via AppraisalPort. FNC represented that the appraisal-report data was "unseen and untouchable by anyone" other than the appraisers and their paying customers and that neither FNC nor any other lending institutions would have

---

[1] *See, e.g.*, *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).

access to the data generated by the appraisers and transmitted via AppraisalPort. Finally, FNC represented to the appraisers that it was not building a database with or otherwise using the data the appraisers transmitted via AppraisalPort. The plaintiffs allege that these representations induced them to provide FNC with data from residential appraisals they had performed.

The plaintiffs also allege that these representations were false. As FNC's chief executive officer stated in an October 2005 interview, "when an appraisal is transmitted to the lender [via AppraisalPort], we are able to pop it open and suck all the data out." According to the plaintiffs, FNC has access to the appraisal data that is transmitted through AppraisalPort, has been copying and warehousing this data, and used it to build the National Collateral Database.

The National Collateral Database is an electronic real-estate-valuation service, collecting appraisal data and other information about residential real-estate properties and making it available to lending institutions as an alternative to paying an appraiser to perform an appraisal. The plaintiffs are thus competitors of the service FNC offers through the National Collateral Database. The electronic real-estate-valuation service FNC offers through the Database competes with the traditional real-estate-valuation services offered by the plaintiffs in two distinct ways. First, if a lender needs appraisal data on a specific property and there is an existing appraisal of that property in the Database, the lender might use that existing appraisal instead of commissioning a new appraisal from one of the plaintiffs. Second, if there is no existing appraisal of that property in the Database, but there are existing appraisals of several comparable properties in the same neighborhood, the lender might choose to estimate that property's value using those existing, comparable appraisals instead of commissioning a new appraisal from one of the plaintiffs.

FNC thus misrepresented to the plaintiffs, in their capacities as customers of AppraisalPort, that the appraisal data they transmitted through AppraisalPort would be secure and unavailable to FNC. In fact, FNC

3

warehoused that data and used it to build the National Collateral Database. These misrepresentations caused injury to the plaintiffs in their capacities as competitors of the Database. Specifically, the plaintiffs, as competing providers of real-estate-valuation services, allege that they have suffered economic injury in the form of lost business because lending institutions consult the National Collateral Database instead of commissioning new appraisals when the same or similar neighboring properties are sold, refinanced, or offered as collateral for a line of credit. The plaintiffs seek to represent themselves and a class of all persons and entities who are engaged in performing appraisals and who have used FNC's AppraisalPort service since its inception through at least April 2007 and were damaged thereby. The district court concluded that the plaintiffs lacked prudential standing under the Lanham Act and granted FNC's 12(b)(6) motion to dismiss.[2]

II.

We review de novo the decision to grant a 12(b)(6) motion to dismiss, applying the same standard as the district court.[3] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to

---

[2] Unlike a dismissal for lack of constitutional standing, which should be granted under Rule 12(b)(1), a dismissal for lack of prudential or statutory standing is properly granted under Rule 12(b)(6). *See Blanchard 1986, Ltd. v. Park Plantation, LLC*, 553 F.3d 405, 409 (5th Cir. 2008). Although FNC does not argue that the plaintiffs lack Article III standing, our independent obligation to assure ourselves of our jurisdiction requires us to examine the constitutional dimension of standing before turning to its prudential aspects. *See Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 331–32 & n.1 (5th Cir. 2002). The three requirements of Article III standing are familiar: the plaintiffs must allege an injury in fact that is fairly traceable to the defendant's conduct and likely to be redressed by a favorable ruling. *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). These plaintiffs clearly satisfy those requirements. They have alleged lost profits caused by FNC's misappropriation of their appraisal data, and an award of damages would remedy that loss. We thus have jurisdiction to determine whether the plaintiffs have prudential standing under the Lanham Act. *Accord, e.g.*, *Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221, 225 (3d Cir. 1998).

[3] *E.g. Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam).

'state a claim to relief that is plausible on its face.'"[4] A claim for relief is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[5] A claim for relief is implausible on its face when "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct."[6]

Section 43(a) of the Lanham Act creates a private remedy for violations of the Act's prohibition against false-advertising:

> Any person who, on or in connection with any goods or services, . . . uses in commerce any . . . false or misleading description . . . [or] misrepresentation of fact, which . . . in commercial advertising or promotion misrepresents the nature, characteristics, [or] qualities . . . of his or her . . . goods, services or commercial activities shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.[7]

This Court has instructed that § 43(a) is "'a remedial statute that should be broadly construed.'"[8] However, that broad construction is subject to the limits of prudential standing. The Lanham Act incorporates prudential restrictions on standing that ensure that only persons whom Congress intended to protect by passing the Lanham Act have standing to sue under it.[9] Congress's intent in

---

[4] *Aschroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[5] *Id.*

[6] *Id.* at 1950.

[7] 15 U.S.C. § 1125(a)

[8] *Scholtzky's, Ltd. v. Sterling Purchasing & Nat'l Distrib. Co.*, 520 F.3d 393, 399 (5th Cir. 2008) (quoting *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1383 (5th Cir. 1996)).

[9] *See Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 561 (5th Cir. 2001) ("'The congressionally-stated purpose of the Lanham Act, far from indicating an express intent to abrogate prudential standing doctrine, evidences an intent to limit standing to a narrow class of potential plaintiffs possessing interests the protection of which furthers the purposes of the Lanham Act.'" (quoting *Conte Bros.*, 165 F.3d at 229)).

passing the Lanham Act was "to protect persons engaged in [interstate] commerce against unfair competition."[10]   Therefore, only persons who have suffered a commercial injury as a result of anti-competitive conduct have prudential standing to sue under the Lanham Act.[11]

We employ a five-factor test to determine whether a plaintiff has prudential standing under the Lanham Act:

> (1) the nature of the plaintiff's alleged injury: Is the injury "of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws"?; (2) the directness or indirectness of the asserted injury; (3) the proximity or remoteness of the party to the alleged injurious conduct; (4) the speculativeness of the damages claim; and (5) the risk of duplicative damages or complexity in apportioning damages.[12]

While a multifactor test such as this one inevitably entails some measure of internal redundancy, it is nonetheless a valuable heuristic.  These factors do not pose five wholly distinct inquiries.  Instead, each turn of the prism illuminates a slightly different facet of a single underlying question.[13]

We discuss each factor in turn.  In summary, the first, third, fourth, and fifth factors weigh in favor of standing, while the second factor weighs against it.  After considering the combined effect of these factors, we conclude that the plaintiffs have prudential standing.

---

[10] *See* 15 U.S.C. § 1127.

[11] *See Procter & Gamble*, 242 F.3d at 561 ("'[The] focus of the statute is on anti-competitive conduct in a commercial context.'" (quoting *Conte Bros.*, 165 F.3d at 229)).

[12] *Id.* at 563 (quoting *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 538 (1983)).

[13] *See Ford*, 301 F.3d at 337 (Benavides, J., specially concurring) ("Although technically distinct, these five factors can be distilled into an essential inquiry, i.e., whether, in light of the competitive relationship between the parties, there is a sufficiently direct link between the asserted injury and the alleged false advertising.").

No. 09-60804

A.

(1)

The nature of the plaintiffs' injury weighs in favor of standing. "The first factor directs us to decide whether the alleged injury is of a type Congress sought to redress in providing a private remedy for violations of the Lanham Act."[14] Congress intended § 43(a) to address injuries caused by a wide—although not unlimited—range of unfair trade practices and anti-competitive conduct.[15] "'The focus of the Lanham Act is on commercial interests that have been harmed by a competitor's false advertising, and [on] securing to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not.'"[16] Only plaintiffs who have suffered an injury that negatively impacts their ability to compete in the marketplace have standing to sue under § 43(a).[17]

Here, the plaintiffs allege they have suffered both of the two kinds of injuries on which the Lanham Act is primarily focused. First, they allege that their commercial interests have been harmed by FNC's false advertising. According to the plaintiffs, FNC's misrepresentations about the confidentiality of the data transmitted via AppraisalPort enabled FNC to obtain the information it needed to build the National Collateral Database. As an electronic real-estate-valuation service, the Database competes with the traditional, in-person

---

[14] *Procter & Gamble*, 242 F.3d at 563.

[15] *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28–29 (2003) ("While much of the Lanham Act addresses the registration, use, and infringement of trademarks and related marks, § 43(a) is one of the few provisions that goes beyond trademark protection." (internal citation omitted)).

[16] *Procter & Gamble*, 242 F.3d at 563 (quoting *Conte Bros.*, 165 F.3d at 234 (internal citations, quotation marks, and brackets omitted)).

[17] *See Conte Bros.*, 165 F.3d at 234 ("The type of injury suffered by Appellants . . . does not impact [their] ability to compete; nor does it detract from [their] reputation or good will. Therefore, the alleged harm is not of the type that Congress sought to redress by enacting the Lanham Act." (citation and internal quotation marks omitted)).

appraisal services offered by the plaintiffs. When a lending institution that otherwise would have commissioned an appraisal of a property instead utilizes the National Collateral Database, the plaintiffs contend that their businesses suffer. This injury—a loss of profits resulting from the weakening of a competitive position caused by a competitor's false advertising—falls squarely within the scope of § 43(a).

The plaintiffs also allege that FNC wrongfully diverted to itself the good will and reputation the plaintiffs had created for their appraisal businesses. As the plaintiffs explained at oral argument, real-estate appraisers accumulate good will and build their professional reputations by bringing their experience and judgment to bear on providing services no database can replicate: inspecting the premises, reporting on recent renovations, identifying damage, and verifying the continued accuracy of existing information. By using the plaintiffs' appraisal data to build the National Collateral Database, FNC was able to misappropriate to itself the good will and reputation associated with the superior quality of in-person, on-the-ground appraisals. This injury, too, is a core concern of § 43(a).

FNC argues that this factor supports dismissal because consumers lack prudential standing under § 43(a)[18] and FNC's alleged misrepresentations were directed toward the plaintiffs in their capacities as consumers of AppraisalPort, not in their capacities as competitors of the National Collateral Database. But this factor focuses not on the identity of the persons who received the misrepresentation but rather on the nature of the injury the misrepresentation caused.[19] The reason consumers do not have standing under the Lanham Act is

---

[18] *Procter & Gamble*, 242 F.3d at 563-64 ("[T]he Lanham Act . . . does not give consumers standing to sue. (citing *Seven-Up*, 86 F.3d at 1383)); *see also Phoenix of Broward, Inc. v. McDonald's Corp.*, 489 F.3d 1156, 1170 (11th Cir. 2007) ("'[T]he several circuits that have dealt with the question are uniform in their categorical denial of Lanham Act standing to consumers.'" (quoting *Made in the USA Found. v. Phillips Foods, Inc.*, 365 F.3d 278, 281 (4th Cir. 2004))).

[19] *See Ford*, 301 F.3d at 338 (Benavides, J., specially concurring) ("[W]e have never required a direct competitive relationship between the plaintiff and the defendant."). This

that the injuries consumers suffer as a result of anti-competitive behavior—being forced to pay a higher price for a good, or being duped into purchasing a lower-quality service—are not the kinds of injuries that the Lanham Act was intended to redress.[20] Here, the plaintiffs allege that FNC's false advertising about AppraisalPort injured their commercial interest in generating new clients for their appraisal businesses, which are competitors of the National Collateral Database. Deterioration of competitive position is precisely the kind of injury the Lanham Act was intended to redress.[21] Therefore, the first factor weighs in favor of standing.

(2)

We conclude that the relationship between the plaintiffs' injuries and FNC's misconduct is, for Lanham Act purposes, relatively indirect. "The issue under this factor is whether the defendants' conduct has had a direct effect on either the plaintiffs or the market in which they participate."[22] The paradigmatic case in which the directness of the plaintiff's asserted injury most clearly supports standing is one in which the defendant's "literally false advertising about its own goods  influenced its customers to buy its products

feature of Fifth Circuit Lanham Act jurisprudence explains why FNC's reliance on *Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 197 (2d Cir. 2001), is misplaced. *See id.* ("To have standing for a Lanham Act false advertising claim, the plaintiff must be a competitor of the defendant . . . ." (citations, internal quotation marks, and brackets omitted)); *see also Famous Horse, Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 112–13 (2d Cir. 2010) (criticizing and declining to apply *Telecom*'s "categorical approach" that treats the existence of a competitive relationship between the plaintiff and the defendant as "a sine qua non of standing").

[20] *See Seven-Up*, 86 F.3d at 1383 ("[I]n light of the pro-competitive purpose language found in § 45, 'consumers fall outside the range of "reasonable interests" contemplated as protected by the false advertising prong of Section 43(a) of the Lanham Act.'" (quoting *Serbin v. Ziebart Int'l Corp.*, 11 F.3d 1163, 1177 (3d Cir. 1993))).

[21] To put it in the same terms used by FNC, the plaintiffs are not suing in their capacities as customers of AppraisalPort. They are suing in their capacities as competitors of the National Collateral Database, and competitors have standing under the Lanham Act.

[22] *Joint Stock Soc'y v. UDV N. Am., Inc.*, 266 F.3d 164, 181 (3d Cir. 2001).

instead of [the plaintiff]'s product."[23]  In that scenario, the plaintiff's injury is an unmediated consequence of the defendant's anti-competitive conduct.[24]  A typical direct-injury scenario thus proceeds in three steps: (1) the defendant runs a false advertisement; (2) the advertisement causes customers to switch from purchasing the plaintiff's product to purchasing the defendant's product; (3) the plaintiff suffers economic injury as a result.

On the other end of the spectrum, the indirectness of the plaintiff's asserted injury most clearly weighs against standing where the defendant's misrepresentations injure the plaintiff only by virtue of the intervening acts of some third party.  For example, in *Joint Stock Society* the plaintiffs were Russian vodka distillers who alleged that they had been injured by the Smirnoff Company's misrepresentations that its vodka was distilled in Russia (in actuality, Smirnoff is an American vodka).[25]  But the plaintiffs sold vodka exclusively in Russia; they had never entered or attempted to enter the American market.  Rather than claim that Smirnoff's misrepresentations injured them directly, they claimed that the misrepresentations made the American market for Russian vodka less profitable, which in turn made importers less willing to purchase and import the Russian vodka that the plaintiffs distilled.[26] The plaintiffs were injured by the defendant's alleged misrepresentations only because third-party vodka importers made independent decisions to purchase and import less Russian vodka.  The Third Circuit held that the plaintiffs' alleged injury was too indirect to support standing.[27]

---

[23] *Logan v. Burgers Ozark Country Cured Hams Inc.*, 263 F.3d 447, 461 (5th Cir. 2001).

[24] *See Procter & Gamble*, 242 F.3d at 563 (explaining that a "case of one competitor's directly injuring another by making false statements about his own goods and thus inducing customers to switch from a competitor" presents a classic Lanham Act false-advertising claim).

[25] *Joint Stock Soc'y*, 266 F.3d at 170.

[26] *Id.* at 182.

[27] *Id.*

Similarly, in *Procter & Gamble*, the plaintiff alleged that the defendant had made misrepresentations to potential employees about the nature of its business, that these misrepresentations had fraudulently induced those potential employees to work for the defendant, and that the defendant had used these employees to sell products to customers who otherwise would have bought products from the plaintiff.[28]  If not for the third-party potential employees' independent decisions to accept the defendant's offer of employment, the plaintiff would not have been injured by the defendant's alleged misrepresentation.  We held that the plaintiffs' claimed injury was too indirect to support standing.[29]

This case falls somewhere in the middle.  There are two ways in which the plaintiffs' injuries are less directly related to FNC's false advertisements than is typical in cases in which plaintiffs have been found to have prudential standing.  First, in the typical direct-injury scenario, the defendant's false advertisement necessarily pertains to the same good or service as to which the plaintiff and the defendant are competitors.  Here, the service about which FNC is alleged to have made misrepresentations is not the same service as to which FNC and the plaintiffs are competitors.  The misrepresentations pertained to a separate part of FNC's business. They were addressed to the plaintiffs not as competitors but as customers.

Second, the plaintiffs' alleged injury—a loss of business due to lenders choosing to utilize FNC's National Collateral Database instead of resorting to a traditional appraisal—was directly caused by FNC's misappropriation of the plaintiffs appraisal data, not by FNC's false advertisements.  FNC's false advertisements were not, of their own force, injurious to the plaintiffs' commercial interests.  Without FNC's second, intervening wrongful act of misappropriating the plaintiffs' appraisal data, FNC's alleged violation of § 43(a)

---

[28] *See* 242 F.3d at 563.

[29] *Id.*

would have caused the plaintiffs no injury at all. Where the typical direct-injury scenario proceeds in three steps, the play giving rise to the plaintiffs' injuries proceeded in six steps: (1) FNC ran a false advertisement about AppraisalPort; (2) the advertisement caused the plaintiffs to entrust FNC with their appraisal data; (3) FNC used that appraisal data to build the National Collateral Database; (4) FNC ran an advertisement truthfully and accurately describing its National Collateral Database; (5) this advertisement caused customers to switch from the plaintiffs to FNC; (6) the plaintiffs suffered economic injury as a result.

At the same time, the plaintiffs' injuries are more direct than were the plaintiffs' injuries in *Joint Stock Society* and *Procter and Gamble* because the same entity that made the misrepresentations ultimately caused the plaintiffs' commercial injury. The plaintiffs were injured by FNC's allegedly false advertising about AppraisalPort because FNC itself allegedly made the decision to misappropriate the appraisal data it received from the plaintiffs. No independent third party intervened to break the chain of causation. Even so, the plaintiffs' injuries are only slightly more direct than the injuries of plaintiffs who have been held to lack prudential standing under the Lanham Act. Yet they are substantially less direct than the injuries of those plaintiffs who have been granted prudential standing. As a result, we conclude that the second factor weighs against prudential standing.

(3)

The plaintiffs are sufficiently proximate to the alleged injurious conduct to have prudential standing. "'[T]he existence of an identifiable class of persons'" who are more immediate to the injury than is the plaintiff and "'whose self-interest would normally motivate them to vindicate the public interest

diminishes the justification for allowing a more remote party'" to bring suit.[30] Customers are "irrelevant to this analysis" because they lack standing to sue under the Lanham Act.[31] If there is a competitor in the marketplace who likely suffered a greater or more serious injury than did the plaintiff as a result of the defendant's alleged misconduct, that competitor is more proximate to the alleged misconduct. For example, in *Conte Brothers* the Third Circuit found that this factor weighed against finding that the plaintiffs—a group of retailers who sold certain varieties of motor oil—had prudential standing to sue the manufacturer of a competing variety of motor oil.[32] The court reasoned that the manufacturers of the motor oils sold by the plaintiffs were more proximately injured by the defendant's misrepresentations about the quality of its product.[33]

Here, the plaintiffs allege that FNC made misrepresentations that induced the plaintiffs to entrust their work product to FNC, that FNC subsequently used the plaintiffs' work product to build a database that was marketed to lenders as an alternative to the plaintiffs' appraisal services, and that lenders are using the National Collateral Database in lieu of the appraisal services offered by the plaintiffs. The plaintiffs have alleged an injury to their own competitive interests that is not derivative of an injury to some other party's competitive position. No identifiable class of persons can be more immediate to the misappropriation of work product than the persons to whom the work product rightfully belongs. The third factor thus weighs in favor of standing.

---

[30] *Procter & Gamble*, 242 F.3d at 563 (quoting *Assoc. Gen. Contractors*, 459 U.S. at 542 (ellipses omitted)).

[31] *Ford,* 301 F.3d at 338 (Benavides, J., specially concurring).

[32] 165 F.3d at 234.

[33] *Id.*

(4)

Because the plaintiffs' damages claim is not speculative, we conclude that this factor also weighs in favor of standing. To state a damages claim that is sufficiently determinate to support Lanham Act standing, a plaintiff must plead that the defendant's anti-competitive conduct either has caused the plaintiff to lose profits or has caused the defendant to gain profits in a definite and ascertainable amount.[34] The disjunctive nature of this requirement bears emphasizing. Because proof of the plaintiff's own lost profits is not a prerequisite to recovery under § 43(a),[35] in *Logan v. Burgers Ozark Country Cured Hams* we concluded that the plaintiff's damages claim was not too speculative to support prudential standing, even though "the jury found that [the plaintiff] had not established *any* actual losses," because the plaintiff had "presented evidence regarding [the defendant]'s profits allegedly resulting from the sale of falsely advertised products and the jury apparently awarded [the plaintiff] some of those profits."[36] So long as the plaintiff adequately pleads some kind of injury,[37] the profits earned by the defendant due to its false advertising are a sufficiently non-speculative measure of the plaintiff's damages.[38] That

---

[34] *See, e.g.*, *Procter & Gamble*, 242 F.3d at 564 (concluding that the plaintiffs' damages claim was too speculative to support standing where the plaintiff both "did not even attempt to submit evidence on lost profits resulting from" the defendant's alleged anti-competitive conduct and also failed to offer evidence establishing the amount of profits the defendant earned because of its alleged anti-competitive conduct).

[35] *See Scholtzsky's*, 520 F.3d at 401 ("Section 43(a) can be satisfied even though a party fails to establish a specific amount of actual loss . . . .").

[36] 253 F.3d at 461 (emphasis added).

[37] *See Scholtzsky's*, 520 F.3d at 400 (explaining that proof that "the plaintiff has been or is likely to be injured as a result of the statement at issue" is a substantive element of a Lanham Act false-advertising claim (citing *IQ Prods. Co. v. Pennzoil Prods. Co.*, 305 F.3d 368, 375 (5th Cir. 2002)).

[38] *See* 15 U.S.C. § 1117(a) (stating that a violation of § 43(a) entitles the plaintiff, "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, *and* (3) the costs of the action" (emphasis added)).

said, this fourth factor is not satisfied where the plaintiff raises a claim for damages (or some other kind of relief) that any member of the public would be equally well-situated to raise.[39]  Even a plaintiff who seeks to rely on the defendant's profits as his measure of damages must allege a damages claim that is personal and particular to him.[40]

Here, the plaintiffs have satisfactorily pleaded two non-speculative damages claims.[41]  The plaintiffs allege that each of them has suffered damages in the form of lost business and profits because lending institutions that use the National Collateral Database otherwise would have purchased appraisals from the plaintiffs.  The plaintiffs also allege that FNC earned substantial profits on the Database that it would not have been able to earn in the absence of the misrepresentations it made in its advertisements for AppraisalPort.  Both of these damages claims are personal to the plaintiffs because they allege that, in earning its profits, FNC unjustly enriched itself at the plaintiffs' expense.[42]

The district court, analyzing this factor and the fifth factor jointly, felt compelled to conclude that the plaintiffs' damages claim was too speculative:

---

[39]  *See Phoenix of Broward*, 489 F.3d at 1171-72 ( "[I]f a request for relief that may be sought by any party sufficed under the fourth factor of the *Conte Bros.* test, that factor would be essentially meaningless, and we refuse to undermine the fourth factor in this way. (quoting *Joint Stock Soc'y*, 266 F.3d at 185)); *Ford,* 301 F.3d at 338-39 (Benavides, J., specially concurring) (concluding that a plaintiff cannot circumvent the fourth factor by abandoning his damages claim and seeking only an injunction).

[40]  *Joint Stock Soc'y*, 266 F.3d at 184.

[41]  Because the district court resolved the prudential-standing question at the motion-to-dismiss stage, our inquiry is limited to whether the plaintiffs' complaint plausibly states a non-speculative claim for damages.  *See supra* notes 4–6; *cf. Defenders of Wildlife*, 504 U.S. at 561 (explaining in the context of Article III standing that each element of standing must be supported "with the manner and degree of evidence required at the successive stages of the litigation," such that "general factual allegations" suffice at the pleading stage while "specific facts" are required [i]n response to a summary judgment motion").

[42]  *See Natural Answers, Inc. v. SmithKline Beechum Corp.*, 529 F.3d 1325, 1332 (11th Cir. 2008) (suggesting that damages are not too speculative to support Lanham Act standing where "the plaintiff has lost [] sales or market share").

Each of the individual plaintiffs must establish: 1) defendant FNC, Inc. utilized the data he submitted through AppraisalPort in building its National Collateral Database; 2) one or more lenders subsequently needed information pertaining to the same property and opted to use the database rather than an appraisal; and 3) had the information not been available in the database, the lender would have chosen him to provide an appraisal (rather than another appraiser). The latter connection is simply too tenuous to support standing.[43]

Our review persuades us that this analysis does not address the features of the plaintiffs' claim that are relevant to this factor. Statement (1), while correct, pertains to liability, not damages. The representations FNC made to the plaintiffs when marketing AppraisalPort are only *mis*representations if FNC actually misappropriated the plaintiffs' data and used it to build the Database instead of keeping the data confidential as its advertisements promised it would. Statement (2) omits half of the plaintiffs' allegations. The plaintiffs allege that the National Collateral Database competes with them in two distinct ways: by enabling lenders to use an existing appraisal of a specific piece of property, and by enabling lenders to use existing appraisals of other, comparable pieces of property. Statement (2) captures the first alleged method of competition but overlooks the second, thereby understating both the extent to which the plaintiffs suffered a personalized injury and the number of occasions on which the plaintiffs were injured. Statement (3) primarily speaks to the complexity of apportioning damages among the class members, not the speculativeness of the very existence of those damages, so we will return to it as part of our discussion of factor five.[44]

---

[43] *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, No. 3:09-CV-7, 2009 WL 2449888, at *1 (N.D. Miss. Aug. 7, 2009) (unpublished).

[44] One aspect of this statement merits mention here. The Supreme Court's decisions in *Iqbal* and *Twombly*, *see supra* note 4, did not alter the long-standing requirement that when evaluating a motion to dismiss under Rule 12(b)(6), a court must "'accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff.'" *True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009) (quoting *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007)).

The plaintiffs allege that the misrepresentations in FNC's advertisements for AppraisalPort induced the plaintiffs to entrust FNC with their appraisal data, that FNC used that data to build the National Collateral Database, and that lenders now use the Database instead of hiring the plaintiffs to perform new appraisals. If, as we must, we accept these allegations as true, it requires no speculation to conclude that FNC's conduct caused the plaintiffs to suffer damages in the form of lost business and diminished profits. Therefore, we conclude that the plaintiffs have alleged a concrete economic injury that is personal to their competitive interests and that the fourth factor weighs in favor of standing.

(5)

The fifth factor also weighs in favor of standing, as there is little risk that allowing this suit to proceed would subject FNC to a risk of duplicative damages or require a complex process of damages apportionment. Although stated in the disjunctive, this factor undertakes a unitary inquiry into "practical concerns of judicial administration."[45] The risk of duplicative damages arises from granting standing to "remote plaintiffs . . . 'at each level in the distribution chain [who] would be in a position to assert conflicting claims to a common fund, thereby creating'" the twin dangers of multiple liability for the same conduct on the one hand and "a 'massive and complex' damages litigation on the other."[46]

---

*Iqbal* and *Twombly*'s emphasis on the plausibility of a complaint's allegations does not give district courts license to look behind those allegations and independently assess the likelihood that the plaintiff will be able to prove them at trial. The plaintiffs' first amended complaint explicitly pleads that FNC has caused the plaintiffs to lose business and profits because more lenders would have used the plaintiffs' appraisal services if the National Collateral Database had not been available. This states a plausible, non-speculative claim for damages. By characterizing this allegation as "too tenuous to support standing," the district court denied it the force to which it was entitled at this early stage of the litigation.

[45] *Conte Bros.*, 165 F.3d at 234 (citing *Assoc. Gen. Contractors*, 459 U.S. at 544–45).

[46] *Id.* (quoting *Assoc. Gen. Contractors*, 459 U.S. at 544–45) (ellipsis omitted).

Factor five takes stock of where the plaintiff is situated in the market vis-a-vis the defendant. This factor originated in the antitrust context, where only overcharged direct purchasers—not ultimate consumers, indirect purchasers, wholesalers, retailers, or other middlemen—have prudential standing to sue under section 4 of the Clayton Act.[47]  Accordingly, we understand the fifth factor's inquiry to be vertical, not horizontal.  In other words, we are not concerned with whether there is a large number of potential claimants who occupy the same position in the market as the plaintiff.[48]  This factor does not weigh against standing merely because the defendant competes in a crowded market in which its false advertisements might cause injury to multiple—or even numerous—direct competitors.  As long as each plaintiff has suffered a distinct economic injury, we need not inquire into how many other similarly situated persons might also have prudential standing.[49]

Rather, our concern is with persons who are differently situated from the plaintiff.  Specifically, this factor urges caution when there are other potential claimants who are closer in the market to the defendant than is the plaintiff.  Under such circumstances, conferring standing on the plaintiff would *a fortiori* entail also conferring standing on any entity that has a more direct competitive relationship with the defendant.[50]  Allowing several disparate groups of

---

[47] *See Assoc. Gen. Contractors*, 459 U.S. at 543–44 (citing *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968) and *Illinois Brick, Inc. v. Illinois*, 431 U.S. 720 (1977)), *cited in Conte Bros.*, 165 F.3d at 226–30 & 233–34.

[48] *Contra Phoenix of Broward*, 489 F.3d at 1172 (arguing that one purpose of the fifth factor is to "assess[] the risk of duplicative damages by examining the number of potential claimants in the same position in the distribution chain as the plaintiff and/or in the same market as the plaintiff").

[49] *Cf. DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342–44 (2006) (explaining that Article III standing requires a plaintiff to allege a personal injury that is particularized and concrete, as opposed to a generalized grievance suffered in common with the public at large).

[50] *Cf. Illinois Brick*, 431 U.S. at 730 (explaining that allowing both direct purchasers and indirect purchasers to bring suit under the Clayton Act "would create a serious risk of multiple liability for defendants"); *id.* at 737 (identifying a proposal to allow "potential

18

plaintiffs—each of which is situated at a different point up or down the chain of competition or distribution—to assert claims against the defendant based on the same misconduct would expose the defendant to multiple liability and create a corresponding risk of duplicative damages. Conversely, the risk of duplicative damages is low when the plaintiff is the market participant most directly injured by the defendant's false advertising,[51] such that allowing the plaintiff's suit to go forward would not necessarily require that any other plaintiffs also be allowed to bring suit.[52]

For example, in *Joint Stock Society*, the Third Circuit concluded that this factor weighed against allowing the plaintiffs to bring suit under the Lanham Act because doing so would have entailed allowing two other groups of plaintiffs—each of which had a more direct competitive relationship with the defendant—to do the same.[53] That court reached the same conclusion in *Conte Brothers*, where a putative class of automotive retailers sought to pursue a Lanham Act claim against a motor-oil manufacturer. Then-Judge Alito reasoned that allowing the suit to go forward would have authorized Lanham Act suits by "every corner grocer in America alleging that his sales of one brand of chocolate bars have fallen" because of the false advertisements of "the manufacturer of another brand" of chocolate bar.[54]

---

plaintiffs at each level in the distribution chain" to bring suit under the Clayton Act as the source of the risk that defendants would be faced with "conflicting claims to a common fund").

[51] *See Assoc. Gen. Contractors*, 459 U.S. at 543–44 ("The indirectness of the alleged injury [] implicates the strong interest . . . [in] avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.").

[52] *Logan*, 253 F.3d at 461 ("Logan appears to be the only plaintiff who would bring a Lanham Act false advertising claim against HoneyBaked based on advertisements involving meat sliced using a method for which he holds the patent.").

[53] *See Joint Stock Society*, 266 F.3d at 184–85.

[54] 165 F.3d at 235.

The fifth factor thus overlaps substantially with the third factor, which inquires into the proximity or remoteness of the plaintiff's injury to the defendant's misconduct.[55]  A plaintiff who is insufficiently proximate to the defendant's misconduct under factor three is almost certainly also so remote and far down the distribution chain that granting standing to the plaintiff would create a risk of duplicative damages under factor five.  Indeed, the *Joint Stock Society* court concluded that there was a risk of duplicative damages under factor five because the plaintiffs appeared at the bottom of a list of potential plaintiffs that was "[r]anked in descending order of proximity to the allegedly unlawful conduct."[56]  And in *Conte Brothers*, the third factor would have regarded the corner grocer's claim as too remote from the manufacturer's misconduct because of the existence of an identifiable class of persons—to wit, the manufacturers of the competing brands of chocolate bars—more proximate to the false advertisements.

In this case, the same considerations that governed our analysis of factor three lead us to conclude that factor five weighs in favor of standing.  There are no potential claimants who are closer in the marketplace to FNC's misrepresentations than the plaintiffs (and the class of all residential real-estate appraisers who transmitted data via AppraisalPort during the limitations period that the plaintiffs seek to represent).  The alleged anti-competitive acts that form the basis of this action are the misrepresentations FNC allegedly made to residential real-estate appraisers to induce them to use AppraisalPort. Residential real-estate appraisers were the only targets of FNC's misrepresentations, and the members of the putative class were the only

---

[55] In *Associated General*, the Clayton Act prudential standing case from which *Conte Brothers* derived its five-factor test, the Supreme Court explicitly tied the risk of duplicative damages to a remote plaintiff suffering an indirect injury.  *See supra* note 51.

[56] 266 F.3d at 184.  Compare this description of the fifth factor with *id.* at 182: "The third factor is the proximity of the plaintiff to the allegedly unlawful conduct."

appraisers who acted on those misrepresentations. Because there are no other potential claimants who are more proximate to FNC in the marketplace than the plaintiffs, there is no risk of FNC incurring multiple liability or of disparate groups of plaintiffs making conflicting claims to the common fund of FNC's profits from the National Collateral Database.[57]

The district court concluded that this factor weighed against standing because it was "too tenuous" to suggest that the plaintiffs would be able to show that "had the information not been available in the database, the lender would have chosen [that particular appraiser] to provide an appraisal (rather than another appraiser)."[58] It thus appears that the district court concluded that damages apportionment would be overly complex because any harm caused by FNC's alleged misconduct likely caused different levels or amounts of damage to different appraisers. But the fifth factor concerns itself with the complexity of allocating damages among differently situated claimants, not within a group or class of claimants who are similarly situated. To the extent there is a risk that difficulties may arise with allocating damages between the various class members in this case, the district court should address those difficulties when

---

[57] In theory, a class of appraisers who never transmitted data via AppraisalPort but have nonetheless lost business as a result of the creation of the National Collateral Database might also try to sue FNC under § 43(a). Because all residential real-estate appraisers are situated in the same competitive position in the marketplace vis-a-vis the Database, this factor would also weigh in favor of standing in such a case. But that possibility does not mean FNC runs the risk of duplicative damages, as other factors would lead us to deny standing to such a class. Congress intended § 43(a) to redress injuries caused by false advertising, and appraisers who never transmitted data via AppraisalPort cannot claim to have been injured by FNC's false advertisements about that service. Other appraisers (specifically, the ones who comprise the putative class in this case) were so injured because the ads induced them to transmit data via AppraisalPort. Appraisers who never entrusted FNC with their data have been injured only by the fact that other appraisers chose to do so. Their injuries are even more indirect than this putative class's because they are the result of the independent decisions of third-parties (other appraisers). And their injuries are derivative of the injuries suffered by the plaintiffs in this case. The first, second, and third factors, respectively, would thus weigh against other appraisers having prudential standing under § 43(a).

[58] *Harold H. Huggins Realty*, 2009 WL 2449888, at *1.

it decides the request for class certification.[59]  No other potential plaintiffs are situated in the same position in the market as the plaintiffs or closer in the market than the plaintiffs to FNC's misrepresentations.  This factor weighs in favor of standing.

## B.

We conclude that, on balance, these five factors counsel in favor of the plaintiffs having prudential standing to sue under § 43(a) of the Lanham Act. The two underlying purposes of the Lanham Act are "'to ferret out unfair competition methods and protect businesses from the unjust erosion of their good will and reputation.'"[60]  Allowing the plaintiffs to go forward with this suit advances both of those purposes.  As explained above, FNC's false advertisements caused an erosion of the plaintiffs' good will and reputation.[61] In addition, FNC is alleged to have used false advertising to gain an unfair competitive advantage over the plaintiffs.  FNC's misrepresentations about AppraisalPort were an essential element of a multifaceted anti-competitive scheme conceived and executed entirely by FNC.  Because FNC's false advertisements were not, of their own force, injurious to the plaintiffs' commercial interests, the plaintiffs' injury is less direct than is typical under § 43(a).  Critically, however, there is no participant in the market who was more directly injured by FNC's anti-competitive conduct.  What is more, each additional step in the chain of causation involves a wrongful act by FNC. FNC's decision to couple its false advertisements with other forms of anti-competitive

---

[59] *See, e.g.*, *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 306-08 (5th Cir. 2003) (holding that class certification is inappropriate where complex, individualized damages calculations predominate over the liability issues that are common to the class).

[60] *Procter & Gamble*, 242 F.3d at 564 (quoting *Conte Bros.*, 165 F.3d at 236).

[61] *See supra* section II(A)(1).

conduct does not make false advertising any less unfair as a method of competition.

We are keenly aware that the Lanham Act is not a general-purpose anti-fraud statute. Plaintiffs who complain of nothing more than a "competitor's fraudulent act in running its business that gives it an advantage" do not have prudential standing under § 43(a).[62] But "there is nothing novel about awarding standing under the Lanham Act to one who has a direct pecuniary interest at stake."[63] The plaintiffs in this case have prudential standing primarily because of the zero-sum competitive relationship that exists between them and FNC in the field of real-estate-valuation services.[64] Lenders who use the National Collateral Database would otherwise use the plaintiffs' appraisal services, FNC was able to create the National Collateral Database only because it stole the plaintiffs' work product, and FNC's taking of the plaintiffs' work product was made possible by the false advertisements FNC ran touting the confidentiality of AppraisalPort. But for the false advertisements FNC targeted at the plaintiffs, the National Collateral Database would not have been able to compete effectively with the plaintiffs' appraisals. It is the inextricable linkage between FNC's false advertisements and the plaintiffs' diminished opportunity to sell appraisals that brings this case within the ambit of § 43(a).[65]

---

[62] *Procter & Gamble*, 242 F.3d at 563.

[63] *Famous Horse*, 624 F.3d at 114 (quoting *PPX Enters., Inc. v. Audiofidelity. Inc.*, 746 F.2d 120, 125 (2d Cir. 1984)).

[64] *See id.* at 113 (describing the existence of a competitive relationship between the plaintiff and the defendant as "a factor that strongly favors standing," since "competition [is] a strong indication of why the plaintiff has a reasonable basis for believing that its interest will be damaged by the alleged false advertising").

[65] *Cf. Procter & Gamble*, 242 F.3d at 563 (denying prudential standing where there were no allegations that but for the defendant's alleged misrepresentations to its employees, the employees would have worked for the plaintiff instead).

No. 09-60804

III.

The plaintiffs have alleged economic injury to their competitive interests as real-estate appraisers. Although FNC's false statements about AppraisalPort were only an indirect cause of the plaintiffs' injuries, no one suffered greater harm because of these false statements than the plaintiffs. The plaintiffs have a concrete, determinate damages claim, and there is no risk that allowing the plaintiffs' suit to go forward will subject FNC to multiple liability or competing damages claims. This case presents unique facts, and we view it as falling just within the outer limits of the zone of interests protected by the Lanham Act. On balance, the five factors relevant to our inquiry indicate that the plaintiffs have prudential standing to sue under § 43(a) of the Lanham Act. Therefore, we reverse the judgment of the district court and remand this action for further proceedings.